1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THE WESTON FIRM**
GREGORY S. WESTON (239944)
JACK FITZGERALD (257370)
888 Turquoise Street
San Diego, California 92109
Telephone: 858.488.1672
Facsimile:  480.247.4553
greg@westonfirm.com
jack@westonfirm.com

**BECK & LEE BUSINESS TRIAL LAWYERS**
JARED H. BECK (233743)
ELIZABETH LEE BECK (233742)
Courthouse Plaza Building
28 West Flagler Street, Suite 555
Miami, Florida 33130
Telephone: 305.789.0072
Facsimile:  786.664.3334
jared@beckandlee.com
elizabeth@beckandlee.com

Counsel for Plaintiffs and the Proposed Classes

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVANGELINE RED and RACHEL WHITT, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KRAFT FOODS INC., KRAFT FOODS NORTH AMERICA, and KRAFT FOODS GOLBAL, INC.,<br><br>Defendants. | Case No. 2:10-cv-01028 GW (AGRX)<br>Pleading Type: Class Action<br><br>**PLAINTIFFS' OPPOSITION TO KRAFT'S MOTION TO STRIKE FIRST AMENDED COMPLAINT**<br><br>Hearing Date: July 26, 2010<br>Time: 8:30 a.m.<br>Courtroom: 10<br>Judge: The Hon. George H. Wu<br><br>Action Filed: February 11, 2010 |

1

# **TABLE OF CONTENTS**

2

I.   INTRODUCTION ................................................................................1

3

II.  ANALYSIS .........................................................................................1

4

   A. The Court Should Not Strike Any Allegations As Preempted ..................1

5

      1.  There Is A Strong Presumption Against Preemption................................1

6

         a.  General Principles................................................................1

7

         b.  The Federal Food, Drug, and Cosmetic Act.................................3

         c.  The National Labeling and Education Act ......................................3

8

         d.  The Determination of Whether a Claim is Preempted ...................5

9

      2.  Section 101.13(i)(3) Is Integral To The FDA's Regulation of Nutrient

10

         Content Claim Advertisements ........................................................6

11

      3.  Plaintiffs Do Not Challenge Any "0g Trans Fat" Statement .................10

12

      4.  Claims That "No Cholesterol" Statements Are False And Misleading

13

         Under California State Law Are Not Preempted ...................................10

14

      5.  Kraft's "Whole Grain" Advertisements Are Not Preempted..................14

15

      6.  Plaintiffs' Claims Are Also Permitted By 21 U.S.C. § 343(a)...............14

16

   B. Plaintiffs State Claims Concerning The Remaining Challenged Health

      Statements Under The Reasonable Consumer Standard...............................16

17

      1.  There Is No Heightened Pleading Requirement Under The "Reasonable

18

         Consumer" Standard .....................................................................16

19

      2.  Plaintiffs Plausibly Allege That Kraft's Health Claims Are Likely To

20

         Mislead A Reasonable Consumer .....................................................19

21

   C. Kraft's Straw Man Argument Should Be Rejected........................................19

22

   D. Kraft's Use of Trans Fat Imposes Significant Medical And Economic Costs

23

      On The Public, Which Congress Did Not Intend.........................................22

24

III. CONCLUSION .................................................................................25

25

26

27

28

i

# TABLE OF AUTHORITIES

## Cases

*Altria Group, Inc. v. Good*, 129 S. Ct. 538 (U.S. 2008)....................................5

*Arizona Cartridge Remanufacturers Ass'n, Inc. v. Lexmark Intern, Inc.*, 421 F.3d 981 (9th Cir. 2005) ..........................................................................17

*Bank of West v. Superior Court*, 2 Cal. 4th 1254 (1992) ..............................16

*Bates v. Dow Agrosciences LLC*, 544 U.S. 431 (2005)................................13

*Brewer v. Indymac Bank*, 609 F. Supp. 2d 1104 (E.D. Cal. 2009) ..............17, 21

*Brockey v. Moore*, 107 Cal. App. 4th 86, 100 (2003) ................................17

*Bronco Wine Co. v. Jolly*, 33 Cal. 4th 943 (2004) .......................................5

*California v. ARC America Corp.*, 490 U.S. 93 (1989) ................................2, 5

*Carus Chem. Co. v. EPA*, 395 F.3d 434 (D.C. Cir. 2005)...............................10

*Chavez v. Blue Sky Natural Beverage Co.*, No. C 06-6609, 2010 U.S. Dist. LEXIS 60554 (N.D. Cal. June 18, 2010) .......................................................15

*Cipollone v. Liggett Group*, 505 U.S. 504 (1992) .......................................2

*Day v. AT&T Corp.*, 63 Cal. App. 4th 325 (1998) .....................................17

*Duncan v. Walker*, 533 U.S. 167 (2001) ....................................................9

*Farm Raised Salmon Cases*, 42 Cal. 4th 1077 (2008) .............................2, 3, 5, 6

*Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132 (1963) ...........2, 5

*Freeman v. Time, Inc.*, 68 F.3d 285 (9th Cir. 1995)..................................16, 17

*Goya de P.R., Inc. v. Santiago*, 59 F. Supp. 2d 274 (D.P.R. 1999).....................4

*Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707 (1985) ......................................................................................2

*Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496 (2003) ....................18, 19

*Mason v. The Coca-Cola Co.*, No. 09-0220-NLH (D.N.J. June 30, 2010).......12, 13

*McKinnis v. Kellogg USA,* No. CV 07-2611, 2007 WL 4766060 (C.D. Cal. Sept. 19, 2007)....................................................................................18

*McKinniss v. Sunny Delight*, No. 07-cv-2-34, 2007 WL 4766525 (C.D. Cal. Sept. 4, 2007).....................................................................................18

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)...........................................2

*Mills v. Giant of Md., LLC*, 441 F. Supp. 2d 104 (D.D.C. 2006)...........................4

ii

*Red, et al. v. Kraft Foods Inc., et al*, Case No. 2:10-cv-01028 GW (AGRx)
**PLAINTIFFS' OPPOSITION TO KRAFT'S MOTION TO STRIKE**

*N.Y. State Restaurant Ass'n v. N.Y. City Board of Health*, 509 F. Supp. 2d 351 (S.D.N.Y. 2007) ................................................................................................8

*N.Y. State Restaurant Ass'n v. N.Y. City Board of Health*, 556 F.3d 114 (2d Cir. 2009)..........................................................................................................8

*Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 642 F. Supp. 2d 1112 (C.D. Cal. 2009) ...................................................................................4, 5

*Shin v. BMW of N. Am.*, CV 09-00398, 2009 U.S. Dist. LEXIS 67994 (C.D. Cal. July 16, 2009) ...........................................................................................21

*Sugawara v. Pepsico, Inc.*, No. 2:08-cv-01335, 2009 U.S. Dist. LEXIS 43127 (E.D. Cal. May 21, 2009) ...........................................................................17, 18

*Videtto v. Kellogg USA*, No. 08-cv-01324, 2009 WL 1439086 (E.D. Cal. May 21, 2009)........................................................................................................18

*Viva! Int'l Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929 (2007).........................................................................................3

*Williams v. Gerber Products Co.*, 552 F.3d 934 (9th Cir. 2008) ..............1, 5, 16, 17

*Wyeth v. Levine*, 129 S. Ct. 1187 (2009) ...........................................................2

*Yumul v. Smart Balance, Inc.*, No. CV 10-00927 (C.D. Cal., May 24, 2010) ...........................................................................................17, 18, 19

**Statutes**

21 U.S.C. § 331(b) .......................................................................................3

21 U.S.C. § 337 ...........................................................................................3

21 U.S.C. § 337(a) .......................................................................................5

21 U.S.C. § 343(a) .............................................................................3, 14, 15, 16

21 U.S.C. § 343(e) .....................................................................................16

21 U.S.C. § 343(q)(1) ...................................................................................7

21 U.S.C. § 343(r) ......................................................................................14

21 U.S.C. § 343(r)(1)(A) ................................................................................3

21 U.S.C. § 343(r)(2) ....................................................................................3

21 U.S.C. § 343(r)(2)(vi) ................................................................................3

21 U.S.C. § 343-1 ....................................................................................3, 14

21 U.S.C. § 343-1(a)(2) ...........................................................................15, 16

21 U.S.C. § 343-1(a)(5) ................................................................................1

iii

Pub. L. No. 101-535 (Nov. 8 1990) 104 Stat. 2353 ................................... 3

## **Other Authorities**

136 Cong. Rec. 5840 (1990).................................................................. 3

136 Cong. Rec. H-12951 (1990) .......................................................... 4

136 Cong. Rec. S-16609 (1990) ........................................................... 4

60 F.R. 57120 (Nov. 13, 1995)............................................................. 5

64 F.R. 62746 (Nov. 17, 1999) ............................................................ 7

68 F.R. 41433 (July 11, 2003) .............................................................. 7

Baer et al., *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets: a randomized crossover study*, 79 Am. J. Clin. Nutr. 969-73 (2004) .................................................................. 22

Bassett et al., *trans-Fatty Acids in the Diet Stimulate Atherosclerosis*, 58 J. Metabolism Clin. And Exper. 1802-1808 (2009) ...........................23, 24

Devore et al., *Dietary fat intake and cognitive decline in women with type 2 diabetes*, 32 Diabetes Care 635-640 (2009)................................22, 23

FDA, "Draft Guidance: Whole Grain Label Statements," Feb. 17, 2006 ............. 15

Gerberding, Julie Louise, *Safer Fats for Healthier Hearts: The Case for Eliminating Artificial Trans Fat Intake*, 151 Ann. Intern. Med. 137-138, 137 (2009) (emphasis added) ............................................................ 24

H.R. Rep. No. 101-538 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336............4, 25

Kummerow, F.A.*, The Negative Effects of Hydrogenated Trans Fats and What to Do About Them*, 205 Atherosclerosis 458-465, 464 (2009) ............................... 24

Lopez-Garcia et al., *Consumption of Trans Fat is Related to Plasma Markers of Inflammation and Endothelial Dysfunction*, 135 J. of Nutr. 562-66 (2005)........ 22

MetLife Market Survey of Long-Term Care Costs.................................... 25

Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils*, 63 Euro. J. of Clin. Nutr. S22-S33 (2009) ................... 22

Mozaffarian et al., *Trans Fatty acids and systemic inflammation in heart failure*, 80 Am. J. Clin. Nutr. 1521-25 (2004) ................................................ 22

Zapolska-Downar et al., *Trans Fatty Acids Induce Apoptosis in Human Endothelial Cells*, 56 J. Phys. And Pharm. 4, 611-625 (2005)................................ 22

1

## **Rules**

2     Fed. R. Civ. P. 8(e) ................................................................. 6

3

4     ## **Regulations**

5     21 C.F.R. § 101, Subpart D ......................................................... 8

6     21 C.F.R. § 101.13 .................................................................. 6

7     21 C.F.R. § 101.13(b) ............................................................... 8

8     21 C.F.R. § 101.13(c) ............................................................... 8

      21 C.F.R. § 101.13(i)(3) ..................................................... passim

9     21 C.F.R. § 101.5 .................................................................. 15

10    21 C.F.R. § 101.54(a) ............................................................... 9

11    21 C.F.R. § 101.54(a)(2) ........................................................... 13

12    21 C.F.R. § 101.54(b) ............................................................... 8

13    21 C.F.R. § 101.54(c) ............................................................... 8

14    21 C.F.R. § 101.54(e) ........................................................... 8, 13

15    21 C.F.R. § 101.54(f) ............................................................... 8

16    21 C.F.R. § 101.54(g) ............................................................... 8

17    21 C.F.R. § 101.56 .................................................................. 8

18    21 C.F.R. § 101.56(a) ............................................................... 9

19    21 C.F.R. § 101.60 .................................................................. 8

20    21 C.F.R. § 101.60(a) ............................................................... 9

21    21 C.F.R. § 101.61 .................................................................. 8

22    21 C.F.R. § 101.61(a) ............................................................... 9

23    21 C.F.R. § 101.62 ............................................................... 6, 8

24    21 C.F.R. § 101.62(a) ......................................................... 9, 11, 14

25    21 C.F.R. § 101.62(d) ....................................................... 9, 10, 11, 12

26    21 C.F.R. § 101.62(d)(i)(A)-(D) .................................................. 11

27    21 C.F.R. § 101.65 .................................................................. 8

28    21 C.F.R. § 101.65(a) ............................................................... 9

      21 C.F.R. § 101.65(d) ............................................................... 8

v

*Red, et al. v. Kraft Foods Inc., et al*, Case No. 2:10-cv-01028 GW (AGRx)
**PLAINTIFFS' OPPOSITION TO KRAFT'S MOTION TO STRIKE**

21 C.F.R. § 101.67 ....................................................................................................8

21 C.F.R. § 101.67(a)(1) ..........................................................................................9

21 C.F.R. § 101.9 ....................................................................................................7

21 C.F.R. § 101.9(c) ................................................................................................7

40 C.F.R. § 156.10(a)(5)(ii) ..................................................................................13

## Constitutional Provisions

U.S. CONST. art. IV, cl. 2 ........................................................................................1

*Red, et al. v. Kraft Foods Inc., et al*, Case No. 2:10-cv-01028 GW (AGRx)
**PLAINTIFFS' OPPOSITION TO KRAFT'S MOTION TO STRIKE**

## I.     INTRODUCTION

Plaintiffs' state-law false advertising claims based upon the "No Cholesterol" and "whole grain" statements on Kraft's labeling are not preempted because the statutory and regulatory framework under the Federal Food, Drug, and Cosmetic Act ("FDCA") and Nutrition Labeling and Education Act ("NLEA") expressly and specifically provides that such statements on food labels must not be "false or misleading." Here, Plaintiffs challenge Kraft's label statements as false and misleading under California law. Accordingly, and pursuant to the applicable preemption provision of the NLEA, there can be no preemption because the very standard Plaintiffs seek to enforce is *identical* to the federal standard. *See* 21 U.S.C. § 343-1(a)(5). As to the balance of the challenged label representations, the Court's Tentative Ruling correctly applied the "reasonable consumer" standard as articulated by the Ninth Circuit in *Williams v. Gerber Products Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008). *See* Tentative Ruling at 8-11. The Court should adopt that portion of the Tentative Ruling in rejecting Kraft's Motion to Strike ("MTS") as to these representations. Accordingly, Kraft's Motion should be denied with the following exceptions: (a) "0g trans fat" (which does not appear on the front labels of any of the products at issue) should be stricken from paragraph 16, line 27, of the First Amended Complaint ("FAC"), and replaced with "no cholesterol;" and (b) Plaintiffs' Lanham Act claim, FAC ¶¶ 99-104, should be stricken, as Plaintiffs agreed at the previous hearing. *See* <u>Exhibit A</u> hereto (First Amended Complaint with suggested modifications).

## II.     ANALYSIS

### A.     <u>The Court Should Not Strike Any Allegations As Preempted</u>

#### 1.     **There Is A Strong Presumption Against Preemption**

##### a.     <u>General Principles</u>

The Supremacy Clause gives Congress the power to preempt state laws concerning matters within Congress's authority. U.S. Const. art. IV, cl. 2.

1

"Consideration of issues arising under the Supremacy Clause starts with the assumption that the historic police powers of the States are not to be superseded by Federal Act unless that is the clear and manifest purpose of Congress." *Cipollone v. Liggett Group*, 505 U.S. 504, 516 (1992) (quotations omitted)). "Accordingly, the purpose of Congress is the ultimate touchstone of pre-emption analysis." *Id.* (citations and quotations omitted).

"[I]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress' . . . because respect for the States as 'independent sovereigns in our federal system' leads us to assume that 'Congress does not cavalierly pre-empt state-law causes of action.'" *Wyeth v. Levine*, 129 S. Ct. 1187, 1194-95 & n.3 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).[1] "[F]ederal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has *unmistakably* so ordained." *Florida Lime & Avocado Growers*, 373 U.S. at 142 (California food law not preempted) (emphasis added).

As a result, "[i]n determining whether federal law preempts state law, a court's task is to discern congressional intent." *Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1087 (2008) *cert. denied*, 129 S. Ct. 896 (2009). Moreover, "the party who asserts that a state law is preempted bears the burden of so demonstrating." *Id.*

---

[1] *See also California v. ARC America Corp.*, 490 U.S. 93, 95, 101 (1989) (party seeking to preempt state law "must overcome the presumption against finding preemption of state law in areas traditionally regulated by the States" and finding laws to "prevent the deception of consumers" within the area of traditional state regulation) (citing *Hillsborough County v. Automated Medical Laboratories, Inc.*, 471 U.S. 707, 716 (1985); *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 146 (1963)).

2

at 1088 (citing *Viva! Int'l Voice for Animals v. Adidas Promotional Retail Operations, Inc.*, 41 Cal. 4th 929, 936 (2007)).

### b.   The Federal Food, Drug, and Cosmetic Act

The FDCA prohibits the misbranding of any food. 21 U.S.C. § 331(b). A food is misbranded if "its labeling is false or misleading in any particular," *id.* § 343(a), or if "a claim is made in the label or labeling of the food which expressly or by implication characterizes the level of any nutrient . . . unless the claim is made in accordance with subparagraph (2)," *id.* § 343(r)(1)(A). Subparagraph 2, in turn, provides that a nutrient content claim may only be made in accordance with the regulations concerning such claims, *see id.* § 343(r)(2), including any regulation that "prohibits the claim because the claim is misleading in light of the level of another nutrient in the food," *id.* § 343(r)(2)(vi).

The FDCA's standing provision is found at 21 U.S.C. § 337, and precludes private enforcement. *See Farm Raised Salmon*, 42 Cal. 4th at 1087.

### c.   The National Labeling and Education Act

Congress amended the FDCA in 1990 with the NLEA, Pub. L. No. 101-535 (Nov. 8 1990) 104 Stat. 2353. "The purpose of the NLEA was to create uniform national standards regarding the labeling of food and to prevent states from adopting inconsistent requirements with respect to the labeling of nutrients." *Farm Raised Salmon*, 42 Cal. 4th at 1086 (citing Remarks of Rep. Waxman, 136 Cong. Rec. 5840 (daily ed. July 30, 1990), debate on H.R. No. 3562, 101st Cong., 2d Sess.). To that end, the NLEA included an express preemption provision, providing that no State "may directly or indirectly establish under any authority or continue in effect as to any food in interstate commerce . . . (5) any requirement respecting any claim of the type described in section 343(r)(1) of this title made in the label or labeling of food that is not identical to the requirement of section 343(r) of this title . . . ." 21 U.S.C. § 343-1.

---

3

The NLEA's legislative record demonstrates the limited scope of its preemption provision. The bill's chief Senate sponsor, Senator Matzenbaum, said the provision is "sensitive to the regulatory roles played by the States. This bill has been refined to provide national uniformity where it is most necessary, but otherwise preserving State regulatory authority where it is appropriate." 136 Cong. Rec. S-16609 (1990). Similarly, the bill's chief House sponsor, Congressman Waxman, stated the provision was limited to "*some* types of preemption of *some* burdensome State laws that interfered with their ability to do business in all 50 States." 136 Cong. Rec. H-12951 (1990) (emphasis added).

The Official House Report on the bill, under the heading "Purposes and Summary," further states, "The bill also contains a provision that would prevent State and local governments from adopting *inconsistent* requirements with respect to the labeling of nutrients or with respect to the claims that may be made about the nutrients in foods." H.R. Rep. No. 101-538, at 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336, 3337 (emphasis added).

The intent of Congress was thus to preempt state laws that would prevent the same label being used throughout the country. For example, Maryland law may not require milk labels to contain a warning about lactose intolerance. *Mills v. Giant of Md., LLC*, 441 F. Supp. 2d 104 (D.D.C. 2006). Nor may Puerto Rico impose a regulation requiring "the name and address of both the canner and the importer be printed" on the label. *Goya de P.R., Inc. v. Santiago*, 59 F. Supp. 2d 274, 280 (D.P.R. 1999).[2] While such particular requirements clearly impede the goal of

---

[2] *C.f. Pom Wonderful LLC v. Ocean Spray Cranberries, Inc.*, 642 F. Supp. 2d 1112, 1122 (C.D. Cal. 2009). There, the court held UCL claims were not preempted despite the defendant's partial compliance with FDA juice labeling regulations, because "as long as Plaintiff's state claims do not impose different requirements than the FFDCA or FDA regulations, these claims are not preempted." This is despite the fact that "it is theoretically possible to create a scenario where a court decision regarding Defendant's product label may conflict

4

1   consistent nationwide labeling, the general state fraud law Plaintiffs seek to

2   enforce here "rel[ies] only on a single, uniform standard: falsity." *Altria Group,*

3   *Inc. v. Good*, 129 S. Ct. 538, 545 (2008).

4               d.      The Determination of Whether a Claim is Preempted

5        The interpretation of the FDCA and the NLEA "is informed by a strong

6   presumption against preemption." *Farm Raised Salmon*, 42 Cal. 4th at 1088

7   (citations omitted). "There can be no doubt that the presumption applies with

8   particular force here" because "consumer protection laws such as the UCL, false

9   advertising law, and CLRA, are within the states' historic police powers . . . . [and

10  l]aws regulating the proper marketing of food, including the prevention of

11  deceptive sales practices, are likewise within the states' historic police powers." *Id.*

12  (citing *Florida Lime & Avocado Growers*, 373 U.S. at 144; *Bronco Wine Co. v.*

13  *Jolly*, 33 Cal. 4th 943, 955 (2004) (describing history of state regulation)).[3]

14       "Although section 343-1 speaks in terms of what states may *not* do, by

15  negative implication, section 343-1 also expresses what states *may* do, i.e., states

16  *may* establish their own requirements pertaining to the labeling of [nutrient content

17  claims] so long as their requirements are identical to those contained in the FDCA

18  in section 343[(r)]." *Id.* at 1086 (citing, *inter alia*, 60 F.R. 57120 (Nov. 13, 1995)

19  (under FDA regulations, "if the State requirement is identical to Federal law, there

20  is no issue of preemption")).

21       When combined with the FDCA's prohibition on private enforcement, 21

22  U.S.C. § 337(a), the statutory framework permitting state laws that impose

23  requirements identical to those under the FDCA may be summarized as follows:

24

25  _____

26  directly with FDA regulations." *Id*. at 1120 (citing *Williams*, 552 F.3d at 940
    (NLEA not intended to "provide a shield for liability for [labeling] deception")).

27       [3] *See also ARC America*, 490 U.S. at 101 (broad standing under California's
    antitrust law not preempted even though narrow federal law standing was

28  necessary to achieve objective of federal law).

1    State-law claims are ***not*** preempted so long as those claims could be pled as

2    violations of the FDCA if the FDCA permitted a private right of action.[4]

3            This is precisely why Plaintiffs' claims in this case are not preempted. As

4    discussed below, if pled as violations of the FDCA, Plaintiffs would state claims

5    for Kraft's violation of 21 C.F.R. § 101.62 and § 101.13 based on its misleading

6    "no cholesterol" front-label statements, and for violation of 21 C.F.R. § 101.13

7    based on Kraft's misleading "whole grain" front-label advertising statements.

8           **2.    Section 101.13(i)(3) Is Integral To The FDA's Regulation of**

9                  **Nutrient Content Claim Advertisements**

10           21 C.F.R. § 101.13(i)(3) is integral to the FDA's regulation of food

11   manufacturers' front-label advertising statements. In setting forth a baseline "false

12   or misleading" standard for all front-label nutrient content claims, § 101.13(i)(3)

13   acts to curb food manufacturers' potential abuses. The framework, as such, sharply

14   distinguishes between information required to be set forth in the Nutrition Facts

15   box (pursuant to other provisions of the NLEA and regulations), and that

16   information which a manufacturer voluntarily sets forth on other portions of the

17   labeling, *i.e.*, "outside" the Nutrition Facts box.

18

19   _____

20          [4] This is the same analysis deployed by the California Supreme Court in

21   *Farm Raised Salmon* to hold that plaintiffs' state law claims were not preempted
     under the NLEA. In that case, the plaintiffs' "unlawful" UCL claim was predicated

22   on a violation of California's Sherman Law, which "incorporates all of the food
     labeling regulations promulgated by the FDA . . ." 42 Cal. 4th at 1090. Plaintiffs

23   demonstrate below why Kraft's statements violate the FDA regulations and, by
     extension, California's Sherman Law. Although the First Amended Complaint's

24   UCL count does not expressly reference the Sherman Law, the Court should

25   nevertheless construe the FAC "so as to do justice" Fed. R. Civ. P. 8(e), and find
     that Plaintiffs' allegations (*i.e.*, that Kraft's statements are false and misleading

26   under FDA regulations) state Sherman Law violations supporting Plaintiffs' UCL
     claim. Alternatively, the Court should allow Plaintiffs to amend that claim to

27   include NLEA and Sherman Law violations as "borrowed" predicates for the

28   UCL's "unlawful" prong.

6

*Red, et al. v. Kraft Foods Inc., et al*, Case No. 2:10-cv-01028 GW (AGRx)
**PLAINTIFFS' OPPOSITION TO KRAFT'S MOTION TO STRIKE**

All packaged food products must contain the familiar Nutrition Facts box. 21 U.S.C. § 343(q)(1); *see also* 21 C.F.R. § 101.9. That box concerns a limited universe of information: standard serving size and number of servings, calories, the amounts of nine specific nutrients, the measure of certain vitamins and minerals, and an ingredient list. *Id*. The information is then highly-regulated in order to ensure uniformity, including such fine details as the order of disclosures, font and background colors, type style and size, use of upper and lower case letters, and line spacing. *See* 21 C.F.R. § 101.9(c). Food manufacturers are also prohibited from voluntarily disclosing any information within the Nutrition Facts box not specifically addressed in the statute or implementing regulations. *Id*.

Certain policy considerations affect, and ultimately determine, the manner in which the FDA requires the disclosure of information within the Nutrition Facts box. For example, as Kraft notes, MTS at 3, the FDA requires the disclosure of less than 0.5g of trans fat per serving as "0g" within the Nutrition Facts box because of the difficulties in measuring trans fat levels below that amount (at least as of 1999), *see* 64 F.R. 62746, at 62758 (Nov. 17, 1999), not because the FDA believes amounts below half-a-gram are insignificant in terms of human health, *see, e.g.*, 68 F.R. 41433, at 41436 (July 11, 2003) ("trans fat consumption [should] be as low as possible").

For these reasons, the FDA regulations provide that disclosures in the Nutrition Facts box are fundamentally different from front-label nutrition content advertisements, and, accordingly, are subject to different governing standards:

> Information that is required or permitted . . . to be declared in nutrition labeling, and that appears as part of the nutrition label [i.e., the Nutrition Facts box], is not a nutrient content claim and is not subject to the requirements of this section. ***If such information is declared elsewhere on the label or in labeling, it is a nutrient content claim and is subject to the requirements for nutrient content claims***.

---

7

21 C.F.R. § 101.13(c) (emphasis added); *see also N.Y. State Restaurant Ass'n*, 556 F.3d 114, 126 (2d Cir. 2009) (21 C.F.R. § 101.13(c) "reflects the FDA's view that a quantitative statement as to a nutrient amount, 100 calories, for example, is not a [nutrient content] claim when such a statement appears in the nutrient panel . . . , *but* is one when it does not." (emphasis in original)); *N.Y. State Restaurant Ass'n v. N.Y. City Board of Health*, 509 F. Supp. 2d 351, 361 (S.D.N.Y. 2007) ("[I]t is clear that under the federal statutory scheme, the mandatory statement of nutrient amount in the familiar Nutrition Facts panel is not a 'claim,' while an identical statement voluntarily made elsewhere on a food product label is a 'claim' subject to § 343(r), [and] the attendant FDA regulations . . . .").

Unlike the highly-regulated, limited universe of the Nutrition Facts box, nutrient content claims and statements manufacturers make outside the box—on the front label and elsewhere—are ***advertising***. And advertising, if not otherwise restricted, is limited only by a manufacturer's imagination. Although the FDA regulates a handful of common advertisements, *see* 21 C.F.R. § 101, Subpart D,[5] the FDA simply cannot anticipate every advertisement a food manufacturer might conceive. Rather than permit "anything goes" advertising, the FDA imposes a baseline standard: any advertisement that "expressly or implicitly characterizes the level of a nutrient of the type required to be made on the [Nutrition Facts box] label under 101.9 [ ] (that is, a nutrient content claim) may not be made unless the claim is made in accordance with this regulation . . . ." 21 C.F.R. § 101.13(b). Thus, a product label may not contain a nutrient content claim that is "false or misleading in any respect . . . ." 21 C.F.R. § 101.13(i)(3).

_____

[5] Specifically, "high" claims (§ 101.54(b)); "good source" claims (§ 101.54(c)); "more" claims (§ 101.54(e)); "high potency" claims (§ 101.54(f)); "antioxidant" claims (§ 101.54(g)); "light" or "lite" claims (§ 101.56); "calorie" or "sugar" claims (§ 101.60); "sodium" or "salt" claims (§ 101.61); "fat, fatty acids, and cholesterol" claims (§ 101.62); implied nutrient content claims (§ 101.65); "healthy" claims (§ 101.65(d)); and nutrient content claims for butter (§ 101.67).

1       This standard applies, however, even to the advertisements the FDA

2  regulates under Subpart D, because—just as the FDA cannot anticipate every

3  advertisement a food manufacturer might conceive—the FDA cannot anticipate

4  every situation in which even a common advertisement regulated under Subpart D

5  might potentially mislead consumers. For example, a statement that a product is

6  "cholesterol free" might meet the disqualifying criteria under § 101.62(d), but

7  would still be highly misleading if stated on a product that contained arsenic—

8  which in terms of its toxicity is not that far removed from trans fat. Thus, every

9  single common nutrient content advertisement regulated under Subpart D is

10  expressly subject to ***both*** the specific applicable disqualifying criteria ***and*** §

11  101.13(i)(3)'s prohibition on false or misleading statements.[6]

12       Finally, the "misleading in any respect" language of § 101.13(i)(3)

13  demonstrates the regulation's expansive scope. If the regulation merely stood for

14  the proposition that a manufacturer may categorically make a nutrient content

15  claim so long as the amount claimed in the advertisement is identical to the amount

16  disclosed in the Nutrient Facts box—the argument Kraft makes, MTS at 4-5—the

17  "misleading" language would be superfluous, since a number can be either true or

18  false (*i.e.*, identical or not identical to the disclosure number in the Nutrition Facts

19  box), but cannot be misleading ***except in context***. Such a narrow reading would not

20  only run afoul of the rules of statutory construction, but defeat the statutory and

21  regulatory framework's manifest purpose of protecting consumers from deceptive

22  advertising practices. *See, e.g.*, *Duncan v. Walker*, 533 U.S. 167, 174 (2001) ("It is

23  our duty to give effect, if possible, to every clause and word of a statute."); *Carus*

24

25       [6] *See*: for "high," "good source," "more," "high potency," and "antioxidant

26  claims, § 101.54(a); for "light" or "lite" claims, § 101.56(a); for "calorie" or "sugar" claims, § 101.60(a); for "sodium" or "salt" claims, § 101.61(a); for "fat,

27  fatty acids, and cholesterol" claims, § 101.62(a); for implied nutrient content

28  claims and "healthy claims, § 101.65(a); and nutrient content claims for butter, § 101.67(a)(1).

9

*Chem. Co. v. EPA*, 395 F.3d 434, 440 (D.C. Cir. 2005) (applying same principle to regulations with the force of law).

### 3.   Plaintiffs Do Not Challenge Any "0g Trans Fat" Statement

As Plaintiffs stated in their Opposition to Kraft's Motion to Dismiss (Dkt. No. 32, at 3 n.3), and reiterated at the hearing, they do not challenge Kraft's trans fat disclosure within the Nutrition Facts box on its products; the single "0g trans fat" reference in the FAC at paragraph 16, line 27, is a typographical mistake (and does not actually appear on any of the products at issue other than in the Nutrition Facts box). Accordingly, Plaintiffs have no objection to striking the erroneous statement from the FAC. (*See* Ex A.)

### 4.   Claims That "No Cholesterol" Statements Are False And Misleading Under California State Law Are Not Preempted

Because Plaintiffs allege that Kraft's "no cholesterol" advertisements are false and misleading under California law, their claims seek only to enforce a standard identical to 21 C.F.R. § 101.13(i)(3)'s prohibition on false and misleading statements. Those claims, therefore, are not preempted.

Kraft argues that its compliance *solely* with 21 C.F.R. § 101.62(d)'s "no cholesterol" disqualifying criteria categorically permits the statement on its front-label advertisements because "[t]here is no language in the more general 'nutrient content' regulation suggesting that it trumps the very detailed requirements [under § 101.62(d)] for the specific 'no cholesterol' regulation." MTS at 4.

Kraft is wrong. Section 101.62 provides that "no cholesterol" advertisements are subject to *both* specific disqualifying criteria under § 101.62(d) *and* the prohibition on false and misleading statements under § 101.13(i)(3):

> A claim about the level of fat, fatty acid, and cholesterol in a food may only be made on the label or in the labeling of foods if: (1) The claim uses one of the terms defined in this section in accordance with

10

1    the definition for that term[7]; [and] **(2) The claim is made in**
2    **accordance with the general requirements for nutrient content**
3    **claims in 101.13**. . . .

4    21 C.F.R. § 101.62(a) (emphasis added).

5        Because § 101.62(a) makes "no cholesterol" statements subject to both
6    specific disqualifying criteria (§ 101.62(d)) and the general prohibition on false
7    and misleading statements (§ 101.13(i)(3)), compliance with the disqualifying
8    criteria of § 101.62(d) cannot, standing alone, sanction a "no cholesterol"
9    statement. A food manufacturer must also comply with § 101.13(i)(3) to
10   permissibly include a "no cholesterol" statement on the label.

11       Kraft argues that, if § 101.13(i)(3)'s prohibition on false and misleading
12   statements applied to "no cholesterol" statements, it would "make little sense" to
13   establish disqualifying criteria for some nutrients under § 101.62(d). *See* MTS at 4.
14   Kraft is incorrect. The § 101.62(d) disqualifying criteria establish standards for "no
15   cholesterol" claims but **only** to the extent and in the context of the specific nutrient
16   levels addressed in that section, *i.e.*, 13 grams of total fat, 2 grams of saturated fat,
17   and 2 milligrams of cholesterol. *See* 21 C.F.R. § 101.62(d)(i)(A)-(D).[8] But §
18   101.62(d) does **not** provide that, so long as a "no cholesterol" advertisement
19   complies with disqualifying criteria for total fat, saturated fat, and cholesterol
20   levels, it is **categorically** non-misleading. That interpretation would render
21   impotent § 101.62(a)'s mandate that a statement comply **both** with § 101.62(d)'s
22   disqualifying criteria **and** § 101.13(i)(3)'s prohibition on false or misleading
23   statements. The regulatory framework's incorporation of the more general and
24   flexible "false or misleading" standard under § 101.13(i)(3), through § 101.62(a),
25   makes perfect sense when one considers that the FDA cannot have anticipated all

26
    _____
    [7] *i.e.*, in the case of "no cholesterol," § 101.62(d).
27   [8] Thus, if Plaintiffs claimed that Kraft's "no cholesterol" advertisement on a
28   product containing 1 gram of saturated fat was misleading **because of its saturated**
     **fat content**, that claim would be preempted.

11

*Red, et al. v. Kraft Foods Inc., et al*, Case No. 2:10-cv-01028 GW (AGRx)
**PLAINTIFFS' OPPOSITION TO KRAFT'S MOTION TO STRIKE**

potentially misleading uses of the statement "no cholesterol" in the disqualifying criteria set forth under § 101.62(d), which addresses "total fat" and saturated fat" levels, *but not trans fat*.[9]

Moreover, the ultimate question of whether Kraft's "no cholesterol" statement is "false or misleading" to a reasonable consumer is not currently before the Court. Therefore, Kraft's argument that it complies with the regulation is premature. *See Mason v. The Coca-Cola Co.*, No. 09-0220-NLH, slip op. at 9-10 (D.N.J. June 30, 2010) (lodged concurrently herewith) ("[I]f Defendant were to ultimately demonstrate that it is compliant with FDA regulations, such fact would more appropriately serve as a defense to any claim . . . than a grounds for preemption."). On this Motion (and Kraft's prior Motion to Dismiss), the Court need only determine whether Plaintiffs state a claim that is not preempted. Because Plaintiffs assert that Kraft's "no cholesterol" advertisements are actionable under the familiar "false and misleading" standard of California state law, their claims are identical to the FDA's prohibition on "false and misleading" statements under § 101.13(i)(3), and therefore are not preempted.

This conclusion is amply supported by the case law. Recently, a New Jersey federal court held that similar claims brought under the New Jersey Consumer Fraud Act were not preempted by the NLEA. *Mason*, slip op. at 6-8. In *Mason*, the

---

[9]  Kraft alternatively argues that it does not fun afoul of §101.13(i)(3) because the "no cholesterol" statements on its products repeat the disclosure in the Nutrition Facts box, *i.e.*, "0mg" of cholesterol. MTS at 4-5. As discussed above, *see* Section II(B)(2) *supra*, that reading of § 101.13(i)(3) is too narrow and should be rejected. If the FDA's intent were to always permit a nutrient content claim whenever the claim repeats the disclosure made in the Nutrition Facts box, it would not have included in the regulation governing such statements the "false or *misleading in any respect*" language. Instead, the FDA would have simply prohibited only those nutrition content claims inconsistent with the amount disclosed in the Nutrition Facts box. But such a truncated regulation would be of limited use in protecting the consuming public. *Cf.* Tentative Ruling at 10 n.4 (discussing case law holding that statements in advertising that are "literally true" may still deceive the public).

1   plaintiff claimed that Coca-Cola's advertising its soft drink as "Diet Coke Plus"

2   was misleading, in violation of FDA regulations, because of the term "Plus." *See*

3   *id.* at 2. Like "no cholesterol" here, the term "plus" is subject to specific and

4   detailed FDA regulations including disqualifying criteria, as well as the "false or

5   misleading" prohibition under § 101.13(i)(3). *See* 21 C.F.R. §§ 101.54(a)(2),

6   101.54(e). Similar to Kraft, Coca-Cola argued that the *Mason* plaintiffs' state law

7   claims sought "to impose obligations on the labeling of its product Diet Coke Plus

8   beyond those imposed by the [FDCA]." *Id.* at 7. The court rejected the argument,

9   holding that the plaintiffs' claims were not preempted because their Complaint

10  "merely allege[s] that Defendant failed to abide by the federal labeling

11  requirements and, in doing so, misled Plaintiffs as a matter of state law." *Id.* at 7-8.

12       The U.S. Supreme Court's decision in *Bates v. Dow Agrosciences LLC*, 544

13  U.S. 431 (2005), also supports Plaintiffs' contention that their state law false and

14  misleading claims are consistent with the FDA's prohibition of false and

15  misleading nutrient content claims under 21 C.F.R. § 101.13(i)(3). Although the

16  *Bates* Court left the ultimate question to the Fifth Circuit to answer,[10] the Court

17  nevertheless made an important and relevant holding: Texas state law claims based

18  on fraud and failure to warn were not preempted insofar as the common-law duties

19  invoked under the Texas statute were equivalent to the Federal Insecticide,

20  Fungicide, and Rodenticide Act's prohibition on labels that are "false or

21  misleading in any particular." *Id.* at 447 (relying on FIFRA regulation promulgated

22  under 40 C.F.R. § 156.10(a)(5)(ii), which was subject to preemption similar to

23  NLEA).[11]

24

25  ――――――――――――――――――
    [10] The Fifth Circuit never had a chance as the case settled soon after remand.

26  [11] Respectfully, the Tentative Ruling's application of *Bates* is incorrect

27  insofar as it incorporates Kraft's mischaracterization of Plaintiffs' claims. It states
    that the Court "did not . . . suggest that such regulatory provisions somehow

28  authorize claims under state law that, as here, would have the effect of imposing
    duties that are inconsistent with federal statutes." Tentative Ruling at 6. Plaintiffs'

13

### 5.    Kraft's "Whole Grain" Advertisements Are Not Preempted

The analysis concerning "no cholesterol" applies equally to Kraft's "whole grain" nutrient content claims with respect to § 101.13(i)(3)'s prohibition on "false and misleading" claims: because Plaintiffs assert that Kraft's "whole grain" advertisements are actionable under the familiar "false and misleading" standard of California state law, their claims are identical to the FDA's prohibition on "false and misleading" statements under § 101.13(i)(3), and are therefore not preempted.

### 6.    Plaintiffs' Claims Are Also Permitted By 21 U.S.C. § 343(a)

If Congress's intent is the cornerstone of preemption, then nothing speaks more directly on the issue of preemption than the statute itself. While NLEA preemption applies to regulations promulgated by the FDA under § 343(r), the statute concurrently provides that *any* food is misbranded if its label is "false or misleading in any particular." 21 U.S.C. § 343(a). This standard applies even to nutrient content claims subject to express preemption under § 343-1, *as the FDA itself has said*. In a 2006 Draft Guidance For Industry and FDA Staff concerning "whole grain" label statements—like the ones Kraft uses and Plaintiffs challenge as misleading here—the FDA noted that while "whole grain" is an express nutrient content claim subject to 21 U.S.C. § 343(r) and the implementing regulations for express nutrient content claims under 21 C.F.R. § 101.13(i)(3), a food manufacturer may only make a "whole grain" claim so long as it is not "false and misleading under section 403(a) of the Act":

> 10.    **Question**: What types of label statements about whole grains are currently permitted to be made on food products?
>
> **Answer**: Manufacturers can make factual statements about whole grains on the label of their products, such as "10 grams

---

state-law claims do not impose duties inconsistent with the federal statutes. Rather, they impose the same duty to avoid "false and misleading" statements that the regulations impose on "no cholesterol" statements (under § 101.62(a) and § 101.13(i)(3)) and "whole grain" statements (under § 101.13(i)(3)).

14

*Red, et al. v. Kraft Foods Inc., et al*, Case No. 2:10-cv-01028 GW (AGRx)
**PLAINTIFFS' OPPOSITION TO KRAFT'S MOTION TO STRIKE**

1   of whole grains," "1/2 ounce of whole grains," (21 CFR
2   101.13(i)(3)) and "100% whole grain oatmeal" (as percentage
3   labeling under 21 CFR 102.5(b)), ***provided that the statements***
4   ***are not false or misleading under section 403(a) of the Act*** and
5   do not imply a particular level of the ingredient, i.e., "high" or
6   "excellent source."

7   FDA, "Draft Guidance: Whole Grain Label Statements," Feb. 17, 2006 (emphasis
8   added).[12]

9       The case law supports the FDA's interpretation. The Honorable Vaughn R.
10   Walker recently held a claim that a beverage's label was false and misleading was
11   not preempted under the FDCA because the express preemption provision of the
12   NLEA does not include the general prohibition on "false or misleading" labeling
13   set forth in 21 U.S.C. § 343(a). *Chavez v. Blue Sky Natural Beverage Co.*, No. C
14   06-6609, 2010 U.S. Dist. LEXIS 60554, at *8 (N.D. Cal. June 18, 2010). Judge
15   Walker applied § 343(a)'s "false and misleading" standard, even though Plaintiff's
16   false origin claims were subject to FDA regulations promulgated pursuant to
17   Section 403(e) of the Act, which—like the nutrient content claims at issue here—
18   are governed by a "not identical" preemption clause, *see* 21 U.S.C. § 343-1(a)(2)
19   (preempting "any requirement for the labeling of food of the type required by
20   section . . . 403(e) that is not identical to the requirement of such section . . . .").

21       *Chavez* involved natural soda beverages and juices sold by Blue Sky, which,
22   during the class period, was a California company. The labels, however, stated
23   Blue Sky was a New Mexico company. *See* 2010 U.S. Dist. LEXIS 60554, at *2.
24   In part, the plaintiff claimed Blue Sky's labeling violated 21 C.F.R. § 101.5, which
25   governs "specification of the name and place of business." *See id.*, at *10-12. That
26   regulation is promulgated pursuant to Section 403(e) of the FDCA, which states

27
28       [12] *Available at* http://www.fda.gov/Food/GuidanceComplianceRegulatoryInf
    ormation/GuidanceDocuments/FoodLabelingNutrition/ucm059088.htm

1    that a food is misbranded "[i]f in package form unless it bears a label containing

2    (1) the name and place of business of the manufacturer, packer, or distributor . . . ."

3    21 U.S.C. § 343(e). Thus, even though, like nutrient content claims governed under

4    Section 403(r), FDA regulations concerning the statement of a manufacturer's

5    name and place of business are subject to express preemption, 21 U.S.C. § 343-

6    1(a)(2), false and misleading claims (like Plaintiffs' here) brought against a food

7    manufacturer (like Kraft) are identical to the false and misleading standard under

8    Section 403(a) (21 U.S.C. § 343(a)), and therefore are not preempted.

### B.    Plaintiffs State Claims Concerning The Remaining Challenged Health Statements Under The Reasonable Consumer Standard

#### 1.    There Is No Heightened Pleading Requirement Under The "Reasonable Consumer" Standard

13   Kraft supplies the wrong standard for determining on a motion to dismiss

14   whether a complaint states a claim under the "reasonable consumer" standard.

15   MTS at 5-13. Kraft would have the Court require a high degree of proof at the

16   pleading stage that challenged advertisements actually mislead consumers. The

17   focus at this stage, however, is on whether a plaintiff alleging deceptive advertising

18   can plausibly demonstrate that a reasonable consumer is likely to be deceived. At

19   the pleading stage, Plaintiff need not satisfy the heightened standard for probability

20   of deception that Kraft demands. *See, e.g., Williams*, 552 F.3d at 939 (a deceptive

21   advertising claim should only be dismissed where it is "impossible" for plaintiff to

22   prevail if allowed to offer evidence under the reasonable consumer standard).

23   Claims under California's UCL, FAL and CLRA are subject to the

24   "reasonable consumer" test, *id.* at 938, which requires that a plaintiff "show that

25   'members of the public are likely to be deceived.'" *Freeman v. Time, Inc.*, 68 F.3d

26   285, 298 (9th Cir. 1995) (quoting *Bank of West v. Superior Court*, 2 Cal. 4th 1254,

27   1267 (1992)). "Although reasonableness can, in appropriate circumstances, be

28   decided as a question of law, 'California courts . . . have recognized that whether a

---

16

1  business practice is deceptive will usually be a question of fact not appropriate for

2  decision on [a motion to dismiss].'" *Yumul v. Smart Balance, Inc.*, No. CV 10-

3  00927, slip op. at 10 (C.D. Cal., May 24, 2010)[13] (quoting *Williams*, 552 F.3d at

4  938); *see also Sugawara v. Pepsico, Inc.*, No. 2:08-cv-01335, 2009 U.S. Dist.

5  LEXIS 43127 (E.D. Cal. May 21, 2009) (same); *Brockey v. Moore*, 107 Cal. App.

6  4th 86, 100 (2003) (same). Moreover, "California false advertising statutes

7  encompass not just false statements but those statements 'which may be accurate

8  on some level, but will nonetheless tend to mislead or deceive.'" *Brewer v.

9  Indymac Bank*, 609 F. Supp. 2d 1104, 1124 (E.D. Cal. 2009) (quoting *Arizona

10  Cartridge Remanufacturers Ass'n, Inc. v. Lexmark Intern, Inc.*, 421 F.3d 981, 985

11  (9th Cir. 2005), quoting in turn *Day v. AT&T Corp.*, 63 Cal. App. 4th 325, 332

12  (1998)).

13      The Ninth Circuit has upheld only a limited number of dismissals based on a

14  failure to meet the reasonable consumer standard as a matter of law, *see Yumul* slip

15  op. at 10-16, none of which share the attributes of this action. *Freeman*, for

16  example, involved claims challenging a mailer that suggested the plaintiff had won

17  a million-dollar sweepstakes. The mailer, however, explicitly stated multiple times

18  that plaintiff would only win the prize if he had the winning sweepstakes number.

19  Thus, the Ninth Circuit held, "it was not necessary to evaluate additional evidence

20  to determine whether the advertising was deceptive, since the advertisement itself

21  made it impossible for plaintiff to prove that a reasonable consumer was likely to

22  have been deceived." *Freeman*, 68 F.3d at 289-90.

23      Recently in *Yumul*, Judge Morrow distinguished every case Kraft relies upon

24  in the context of claims closely resembling those brought by Plaintiffs in this case,

25  and held the plaintiff's claims did ***not*** warrant dismissal under the reasonable

26  consumer standard. Judge Morrow noted, for example, that the court dismissed the

27

28      _____

      [13]  Lodged concurrently with Plaintiffs' Opposition to Kraft's Motion to
      Dismiss, *see* Dkt. No. 32.

1   complaint in *McKinnis v. Kellogg USA,* No. CV 07-2611, 2007 WL 4766060 (C.D.

2   Cal. Sept. 19, 2007), *see* MTS at 10, because the allegation that "Froot Loops"

3   themselves resemble fruit is "not rational, let alone reasonable. The cereal pieces

4   are brightly colored rings, which in no way resemble any currently known fruit."

5   *Yumul*, slip op. at 12 (quoting *McKinnis v. Kellogg*, 2007 WL 4766060, at *4); *see*

6   *also id.* at 13 n.13 (same analysis with respect to *Videtto v. Kellogg USA*, No. 08-

7   cv-01324, 2009 WL 1439086 (E.D. Cal. May 21, 2009), *see* MTS at 10). Judge

8   Morrow also disregarded *McKinniss v. Sunny Delight*, No. 07-cv-2034, 2007 WL

9   4766525 (C.D. Cal. Sept. 4, 2007), *see* MTS at 9-10, as bad law in light of

10  *Williams*. *See id.* at 12-15.[14] Finally, Judge Morrow noted that the court in

11  *Sugawara*, dismissed a claim that "Cap'n Crunch with Cruncherries" cereal was

12  misleading because the court was "not aware of, nor had plaintiff alleged the

13  existence of, any actual fruit referred to as a 'crunchberry'" and because the

14  packaging showed that the "crunchberries" were "round, crunchy, brightly-colored

15  cereal balls, and the packaging clearly stated both that the product contains

16  'sweetened corn & oat cereal' and that the cereal itself was 'enlarged to show

17  texture.'" *Id.* at 11-12 (quoting *Sugawara*, 2009 WL 1439115, at *3).

18      Kraft's reliance on *Lavie v. Procter & Gamble Co.*, 105 Cal. App. 4th 496

19  (2003), MTS at 6, is also misplaced. The issue in *Lavie* was whether California's

20  UCL and FAL were subject to the "reasonable consumer" standard, or a lower,

21  "least sophisticated consumer" standard. In surveying the case law, the court

22  reviewed cases that did not expressly apply a "reasonable consumer" standard but

23  instead asked whether a challenged advertisement was "likely to deceive" the

24  consumer. Fairly read, *Lavie* stands only for the unremarkable proposition that a

25  "reasonable consumer" standard applies to UCL and FAL claims—not that the

26  ───────────────

27  [14] Moreover, *McKinniss* is readily distinguishable. There, the core allegation
    was that images of fruit implied high fruit content. However, the actual fruit juice

28  content was explicitly disclosed as "5% fruit juice." Kraft makes no analogous
    disclosures on its products with respect to trans fat or its hazards to human health.

1   reasonable consumer standard requires the high level of proof of "probable"

2   deception (a term Kraft never actually defines) that Kraft demands at this stage.

3   Moreover, *Lavie* concerned the appeal of a verdict rendered *after a bench trial*, not

4   at the pleadings stage. *Id.* at 499.

### 2. Plaintiffs Plausibly Allege That Kraft's Health Claims Are Likely To Mislead A Reasonable Consumer

7          The court should adopt that portion of the Tentative Ruling holding that

8   Plaintiffs' claims concerning the majority of challenged Kraft statements should

9   survive dismissal under the reasonable consumer standard. As noted throughout,

10  *see* Tentative Rule at 8-11, none of the challenged statements can be dismissed as a

11  matter of law because it is not it impossible for Plaintiffs to prove the statements

12  are misleading, especially when the packaging of each challenged product is

13  "taken as a whole," *Yumul*, slip op. at 11, and viewing the facts in the light most

14  favorable to Plaintiffs. This holding is consistent with Judge Morrow's holding in

15  *Yumul* that similar claims concerning a product containing trans fat should not be

16  dismissed under the reasonable consumer standard. *Id.* at 15.

### C.   Kraft's Straw Man Argument Should Be Rejected

18         Kraft's Motion depends largely on a straw man argument confusingly woven

19  throughout the memorandum, but best summarized on page 7. According to Kraft:

20  (1) Plaintiffs' complaint alleges Kraft's statements are misleading because Kraft

21  deceptively omits the fact that the products contain trans fat. (2) The products

22  would not be misleading if their packaging stated that they contained trans fat. (3)

23  However, Kraft is prohibited from stating that its products contain trans fat by the

24  FDA regulation requiring the expression of sub-0.5g per serving levels of trans fat

25  in the Nutrition Facts box as "0g." (4) Kraft could not have deceptively omitted the

26  fact that its products contain trans fat, because federal law prevents it from

27  declaring the statement that Plaintiffs seek. (5) Since the disclosure of trans fat in

28

19

*Red, et al. v. Kraft Foods Inc., et al*, Case No. 2:10-cv-01028 GW (AGRx)
**PLAINTIFFS' OPPOSITION TO KRAFT'S MOTION TO STRIKE**

1  the Nutrition Facts box is compliant with the regulation, no consumer could be

2  misled by Kraft's general health statements elsewhere on the label. *See* MTS at 7.

3      This argument depends on a number of mischaracterizations and wild leaps

4  of logic. First, Plaintiffs' claims that the challenged statements are misleading do

5  not depend on the allegation that Kraft omits the actual trans fat content—rather,

6  the statements are misleading because the products contain trans fat. Plaintiffs do

7  not, as Kraft suggests, seek to make Kraft declare (either in the Nutrition Facts box

8  or elsewhere) the actual amount of trans fat. Plaintiffs only seek to prevent Kraft

9  from making false and misleading advertisements that suggest the Kraft products

10  are healthy when, in fact, they contain a toxic ingredient. Thus, the First Amended

11  Complaint seeks an order enjoining Kraft from continuing such violations of

12  California and federal law (*see* FAC Prayer for Relief); it does not seek any relief

13  which would require Kraft to make an affirmative trans fat disclosure.

14      Kraft also illogically assumes that no consumer could be misled by ***front-***

15  ***label*** advertisements simply because the FDA requires the disclosure of sub-0.5g

16  per serving trans fat levels as "0g" in the Nutrition Facts box. That makes no sense

17  because the technical means in which the FDA requires disclosure of a nutrient is

18  not likely to affect a consumer's thought process when viewing advertisements on

19  a food's label. Kraft further ignores that Kraft makes the challenged claims

20  ***voluntarily***; while the FDA may require Kraft to disclose trans fat levels in a

21  particular manner within the Nutrition Facts box, nothing requires Kraft to make

22  any of the front-label advertising statements that are the basis for Plaintiffs' false

23  advertising claims. Thus, Kraft could cure its unlawful behavior by simply

24  removing the challenged advertisements.

25      To the extent Plaintiffs allege Kraft's failure to disclose that its products

26  contain trans fat, though, any such obligation arises directly from Kraft's voluntary

27  and misleading front-label statements, ***not*** from the FDA-mandated disclosure in

28  the Nutrition Facts box. In *Shin v. BMW of N. Am.*, CV 09-00398, 2009 U.S. Dist.

20

1   LEXIS 67994, at *3-6 (C.D. Cal. July 16, 2009), a court in this District held that

2   plaintiffs claims—which in part were based on a material omission—should

3   survive a motion to dismiss under the reasonable consumer standard. Plaintiffs

4   there alleged that BMW failed to disclose that the aluminum alloy wheels affixed

5   to "low profile" tires on certain BMWs are subject to premature cracking. *Id.* at *1.

6   The Honorable A. Howard Matz held that plaintiffs' allegations were sufficient to

7   state a claim of deceptive conduct based on an omission of material fact, which

8   defendant was obliged to disclosed based on (1) the defendant's exclusive

9   knowledge of material facts not known to plaintiffs, (2) the defendant's active

10  concealment of a material fact from plaintiff, and (3) ***the defendant's partial***

11  ***representations, but concurrent suppression of some material fact***. *Id.* at *3-4

12  (emphasis added). Here, Plaintiffs allege facts supporting all three circumstances

13  giving rise to Kraft's obligation to disclose that its products contain trans fat where

14  Kraft voluntarily elects to advertise on its labels that the products are healthy. *See,*

15  *e.g.* FAC ¶¶ 16, 58-87. "A perfectly true statement couched in such a manner that

16  is likely to mislead or deceive the consuer, ***such as by failure to disclose other***

17  ***relevant information***, is actionable under Section 17500." *Brewer*, 609 F. Supp. 2d

18  at 1124 (citation omitted, emphasis added).

19      Finally, Plaintiffs do not assert, and need not prove, that a reasonable

20  consumer would have to believe, based on the challenged statements, that the Kraft

21  products are "healthy in every single aspect" or "every possible way." *See* MTS at

22  10. Rather, Plaintiffs allege that the statements are misleading because the trans fat

23  in the products causes cancer, coronary heart disease, and type-2 diabetes. Kraft's

24  example—that a milk company should not be prevented from touting the calcium

25  content of its milk just because the milk contains calories—only highlights the

26  crucial difference in this case. While calories are necessary to sustain life, trans fat

27  is a poisonous synthetic carcinogen that causes preventable death.

28

21

*Red, et al. v. Kraft Foods Inc., et al*, Case No. 2:10-cv-01028 GW (AGRx)
**PLAINTIFFS' OPPOSITION TO KRAFT'S MOTION TO STRIKE**

### D.    <u>Kraft's Use of Trans Fat Imposes Significant Medical And Economic Costs On The Public, Which Congress Did Not Intend</u>

Although the First Amended Complaint describes in great detail the deadly effect of trans fat on human health, FAC ¶¶ 17-59, even this substantial treatment is not exhaustive. For example, the FAC focuses on how the artificial trans fat in Kraft's products causes heart disease by raising consumers' LDL blood cholesterol levels; but trans fat also causes heart disease because it interferes with the normal operation of the endothelial cells that line, regulate, and protect the heart and arteries.[15] Artificial trans fat further damages the heart and other vital organs by causing chronic systemic inflammation, where the immune system becomes persistently overactive, damages cells, and causes organ dysfunction.[16]

The devastating impact of Kraft's trans-fat laden products on endothelial cells is also how trans fat causes diabetes. Further, in addition to *causing* type 2 diabetes, artificial trans fat also *accelerates* diabetes-related health decline.[17] The study demonstrating this covered 1,486 participants and carefully controlled for body mass index, physical activity, diabetes severity, depression, vitamin E supplement use, alcohol intake, smoking status, and history of high blood pressure, high cholesterol, or myocardial infarction. Even after controlling for these factors, the tertile of women who consumed the largest amount of trans fat suffered

---

[15] *See* Zapolska-Downar et al., *Trans Fatty Acids Induce Apoptosis in Human Endothelial Cells*, 56 J. Phys. And Pharm. 4, 611-625 (2005); Lopez-Garcia et al., *Consumption of Trans Fat is Related to Plasma Markers of Inflammation and Endothelial Dysfunction*, 135 J. of Nutr. 562-66 (2005).

[16] *See id*; *see also* Baer et al., *Dietary fatty acids affect plasma markers of inflammation in healthy men fed controlled diets: a randomized crossover study*, 79 Am. J. Clin. Nutr. 969-73 (2004); Mozaffarian & Clarke, *Quantitative effects on cardiovascular risk factors and coronary heart disease risk of replacing partially hydrogenated vegetable oils with other fats and oils*, 63 Euro. J. of Clin. Nutr. S22-S33 (2009); Mozaffarian et al., *Trans Fatty acids and systemic inflammation in heart failure*, 80 Am. J. Clin. Nutr. 1521-25 (2004).

[17] *See* Devore et al., *Dietary fat intake and cognitive decline in women with type 2 diabetes*, 32 Diabetes Care 635-640 (2009).

1   cognitive decline equivalent to 7 years of added aging compared to tertile of
2   women who consumed the lowest amount, yet this difference in consumption
3   between these two carefully controlled ground amounted to about 2.1g per day. *Id.*
4   at 637. This result was statically significant at a 99.8% level. *Id.* at 637, Table 2.
5   The authors further note that their results are consistent with other studies showing
6   trans fat causes diabetes by inducing insulin resistance, and suggest trans fat causes
7   Alzheimer's disease, as "insulin resistance, high insulin levels, and cholesterol are
8   all implicated in β-amyloid accumulation in the brain—the pathologic hallmark of
9   Alzheimer's disease." *Id.* at 639.

10      Such devastating effects on the brain and immune system from the
11   consumption of just a couple of grams of artificial trans fat per day is consistent
12   with studies of its effects on the heart, which likewise show much increased rates
13   of death and chronic disease from even such small consumption. *See* FAC at ¶¶26-
14   38.

15      As the case against human consumption of any artificial trans fat has
16   become nearly conclusive, many food manufacturers have removed it entirely from
17   their products (in some cases only after being sued for it). But Kraft persists in
18   using trans fat in essentially all of its packaged products, even as the evidence piles
19   up. In just the past two years, the case against trans fat consumption has become all
20   the more clear. In June 2009, scientists found that mice fed a control diet "did not
21   exhibit appreciable atherosclerotic plaque formation," but adding trans fat to their
22   diet stimulated atherosclerotic development on its own, "which is an event not
23   normally observed in [mice]."[18] Further, "the higher the circulating [trans fat] was,
24   the more extensive were the atherosclerotic lesions," *id.*, thus showing trans fat
25   consumption "can directly induce atherosclerosis." *Id.* at 1807. The authors
26   extrapolated the data to estimate the human implications of trans fat consumption,

27
28      [18] Bassett et al., *trans-Fatty Acids in the Diet Stimulate Atherosclerosis*, 58 J.
     Metabolism Clin. And Exper. 1802-1808 (2009).

23

*Red, et al. v. Kraft Foods Inc., et al*, Case No. 2:10-cv-01028 GW (AGRx)
**PLAINTIFFS' OPPOSITION TO KRAFT'S MOTION TO STRIKE**

and found "the [trans fat] dosage provided to the mice . . . [was] similar to the average human [trans fat] consumption values," *id.*, which "lends credence to the efforts to reduce [trans fat]'s presence in foods available to the public today." *Id.*

Dr. Julie Gerberding, former director of the Center for Disease Control, states "[t]he scientific rationale for eliminating exposure to artificial trans fatty acids in foods . . . [is] ***rock solid.***"[19] In assessing the feasibility of eliminating trans fat from the American diet, Dr. Gerberding noted that while "[t]rans fats are ubiquitous . . . they are by no means essential to food processing, packaging, or preparation. . . . [and, a]s demonstrated in Denmark, removing artificial trans fats from the diet can be achieved *without apparent social or economic harm.*" *Id.* Similarly, Dr. Fred Kummerow of the University of Illinois writes:

> Partially hydrogenated fats change plasma lipid levels in negative ways. They calcify cells and cause inflammation of the arteries, which are known risk factors in heart disease. They are not metabolized the same way as the trans vaccenic acid in ruminant fat and are not harmless. Trans fats inhibit cyclooxygenase (COX-2) an enzyme which converts arachidonic acid to an eicosanoid that is necessary to prevent blood clots in the arteries and veins. A blood clot in the coronary arteries can result in sudden death. . . . The only course to protect the health of consumers is to eliminate the production of partially hydrogenated trans fats.[20]

The costs of trans fat consumption are thus staggering when weighed against the comparatively insignificant profit Kraft earns when it uses artificial trans fat instead of slightly more expensive natural fats in its products. To continue with the

---

[19] Gerberding, Julie Louise, *Safer Fats for Healthier Hearts: The Case for Eliminating Artificial Trans Fat Intake*, 151 Ann. Intern. Med. 137-138, 137 (2009) (emphasis added).

[20] Kummerow, F.A*., The Negative Effects of Hydrogenated Trans Fats and What to Do About Them*, 205 Atherosclerosis 458-465, 464 (2009).

1    previous example, expenses associated with diabetes-related dementia and
2    cognitive decline can be enormous: the average trans-fat induced cognitive decline,
3    equal to seven years of natural aging, would in many cases be the difference
4    between self-sufficiency and an annual bill of $72,270 for nursing home care or
5    $37,572 annually for assisted living centers.[21] Such expense, of course, would not
6    be borne by Kraft, but rather by its poisoned customers, their families, and state
7    and federal governments that pay for the bulk of nursing and assisted living care
8    via Medicare and Medicaid—essentially the entire nation outside Kraft itself,
9    which unconscionably profits from trans fat use. Congress, in passing the NLEA to
10   inform and protect consumers, could not have intended, as Kraft suggests, to
11   immunize such conduct.

12       This conclusion fully accords with the NLEA's stated goal of "help[ing]
13   Americans to maintain a balanced and healthful diet," by providing them with
14   information to "reduce the risk of chronic diseases such as cancer and heart
15   disease." H.R. Rep. No. 101-538, at 7 (1990), *reprinted in* 1990 U.S.C.C.A.N.
16   3336, 3338-39. Nothing in the NLEA's history shows Congress's intent to
17   immunize companies like Kraft from general state consumer protection and fraud
18   laws, especially when that fraud causes thousands of deaths each year from the
19   chronic diseases the NLEA was enacted to prevent.

20   **III.   CONCLUSION**

21       For the foregoing reasons, Plaintiffs respectfully request that the Court deny
22   Kraft's Motion to Strike and related Motion to Dismiss. In the event the Court
23   dismisses any portion of the First Amended Complaint, Plaintiffs respectfully
24   request that it be without prejudice and with leave to amend.

25

26

27

28

---

[21] Average United States prices from most recent MetLife Market Survey of Long-Term Care Costs, *available at* http://MatureMarketInstitute.com.

25

1   DATED: July 16, 2010           Respectfully Submitted,

2

3                              /s/ Jack Fitzgerald

4                              Jack Fitzgerald
                                **THE WESTON FIRM**

5                              GREGORY S. WESTON
                              JACK FITZGERALD

6                              888 Turquoise Street

7                              San Diego, CA 92109
                              Telephone: (858) 488-1672

8                              Facsimile:  (480) 247-4553

9

10                          **BECK & LEE BUSINESS TRIAL LAWYERS**

11                          JARED H. BECK

12                          ELIZABETH LEE BECK
                              Courthouse Plaza Building

13                          28 West Flagler Street, Suite 555

14                          Miami, FL 33130
                              Telephone: (305) 789-0072

15                          Facsimile:  (786) 664-3334

16

17                        **Counsel for Plaintiffs and the Proposed Classes**

18

19

20

21

22

23

24

25

26

27

28