# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | |
|---|---|
| Case No. | CV 10-1028-GW(AGRx) |
| Title | *Evangeline Red, et al. v. Kraft Foods, Inc., et al.* |
| Date | April 12, 2012 |

Present: The Honorable **GEORGE H. WU, UNITED STATES DISTRICT JUDGE**

| Javier Gonzalez | Pat Cuneo | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:

Gregory S. Weston
John Joseph Fitzgerald IV
Ronald A. Marrow
Gillian C. Wade
Sara D. Avila

Attorneys Present for Defendants:

Kenneth K Lee
Dean N. Panos

**PROCEEDINGS:** PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION (filed 12/19/11);

PLAINTIFFS' MOTION TO STRIKE OR EXCLUDE THE DECLARATION OF PROFESSOR RAN KIVETZ (filed 03/15/12)

The Court's Tentative Ruling is circulated and attached hereto. Court hears oral argument. For reasons stated on the record, the motions are **TAKEN UNDER SUBMISSION** and continued to **April 26, 2012 at 8:30 a.m.** Counsel will contact the court clerk by April 24, 2012 whether a hearing will be required. Court to issue ruling.

 1 : 00

Initials of Preparer  JG

*__Evangeline Red, et al. v. Kraft Foods, Inc., et al.__*; Case No. CV-10-1028
Tentative Ruling on Renewed Motion for Class Certification

**I. Background**

This putative class action lawsuit was filed by Plaintiffs Evangeline Red ("Red") and Rachel Whitt ("Whitt") (collectively "Plaintiffs") against Defendants Kraft Goods, Inc., Kraft Foods North America, and Kraft Foods Global, Inc. (collectively "Kraft" or "Defendants") on February 11, 2010. *See* Docket No. 1. Plaintiffs claim that Kraft falsely markets numerous food products (collectively the "Products"), namely Teddy Grahams, many varieties of Ritz Crackers, Original Premium Saltine Crackers, Honey Maid Graham Crackers, Vegetable Thins and Ginger Snaps, as healthy, despite the fact that they contain high levels of partially hydrogenated vegetable oil ("PHVO"), "as well as a variety of unhealthy, highly-refined, highly-processed, and nutritionally empty ingredients," and thus allegedly cause health problems including cardiovascular disease, diabetes and cancer. *See* Pl.'s Second Amended Complaint ("SAC"), Docket No. 58 ¶¶ 5, 31-43, 44-47, 48-54. As such, Plaintiffs claim that Kraft's labeling of the Products violates (1) the California Unfair Competition Law's prohibition of unlawful business acts or practices; (2) the California Unfair Competitions Law's prohibition against unfair or fraudulent business practices or acts; (3) California's False Advertising Law, and (4) the federal Consumer Legal Remedies Act. *See generally* SAC.

Plaintiffs filed for class certification once before, on May 13, 2011. After a hearing, this Court denied the motion without prejudice on September 29, 2011 (the "September Order"). *See* Docket No. 145. Plaintiffs now bring a renewed class certification motion. *See* Docket No. 156. The renewed motion for class certification differs from the first in many respects, primarily: 1) instead of proposing a nationwide class, the class is limited to California consumers; 2) instead of one class consisting of consumers who purchased any of the Products, Plaintiffs now propose seven subclasses, one for each Product; 3) each subclass contains a requirement that the purchased food have borne the packaging that Plaintiffs allege to be unlawful; 4) whereas the previous motion for class certification sought to include consumers who purchased the products as early as 2000, the subclasses' date restrictions propose an earliest purchase date of January 1, 2004 (for the Honey Maid Grahams Subclass), with five of the subclasses defined so as to include consumers who purchased the products no earlier than 2006, and one defined so as to include only consumers who purchased the product no earlier than 2007. *See id.* 1-2. In addition, in its reply brief, Plaintiffs respond to one of Defendants' arguments as to ascertainability by proposing end-dates to some of the subclasses, since Defendants apparently contend that the challenged labeling only occurred up until various dates in 2010 or 2011 for some of the products. Thus, the currently proposed subclasses are as follows:

> The **Ginger Snaps Subclass**: All persons who purchased in California, on or after February 11, 2006, and on or before December 31, 2010, Ginger Snaps in packaging

bearing the phrase "sensible solution."[1]

The **Vegetable Thins Subclass**: All persons who purchased in California, on or after January 1, 2007, Vegetable Thins in packaging bearing the phrase "made with real vegetables."

The **Premium Saltines Subclass**: All persons who purchased in California, on or after February 11, 2006, and on or before June 30, 2011, Premium Saltines in packaging bearing the phrases "sensible snacking," or "sensible solution."[2]

The **Teddy Grahams Subclass**: All persons who purchased in California, on or after February 11, 2006, and on or before December 31, 2011, 10-ounce or 9.5-ounce varieties of Teddy Grahams in packaging bearing the phrases "sensible snacking," "sensible solution," "smart choices," or "help support kids' growth and development."

The **Honey Maid Grahams Subclass**: All persons who purchased in California, on or after January 1, 2004, Honey Maid Grahams in packaging bearing the phrases "sensible snacking," "sensible solution," or "wholesome."

The **Ritz I Subclass**: All persons who purchased in California, on or after February 11, 2006, and on or before June 30, 2010, Reduced Fat, Whole Wheat, Hint of Salt, or Low Sodium varieties of Ritz Crackers in packaging bearing the phrases "sensible snacking" or "sensible solution."

The **Ritz II (Roasted Vegetable) Subclass**: All persons who purchased in

---

[1] The Court would note that Kraft's argument that Plaintiffs lack standing as to the Ginger Snaps Subclass fails (though only just): Kraft argues that neither Red nor Whitt purchased Ginger Snaps during the class period. However, Red testified at her deposition that she stopped purchasing ginger snaps "in 2006." *See* Docket No. 176, Exh. 60 at 201. Since the class period includes most of 2006, the Court will not presume that her statement "in 2006" meant "in January or February of 2006." The Court would note, however, that if further discovery indicates that she did not purchase Ginger Snaps during the class period, the Ginger Snaps Subclass should at that point be decertified since no class representative would have standing to pursue the claims on behalf of the absent class members.

[2] To the extent that Defendants argue Plaintiffs have improperly broadened the Premium Saltines Subclass so as to include varities of Saltines that Plaintiffs never purchased, the Court agrees with Defendants that Plaintiffs would lack standing; thus to the extent the Court would certify any Premium Saltines Subclass at a future time, the Court would certify a such a Subclass so as to include only purchasers of regular Premium Saltines, and not purchasers of Premium Saltines Unsalted Tops, Premium Saltines Multigrain, Premium Saltines Fat-Free and Premium Saltines Low Sodium. Certifying the Premium Saltines Subclass to include only purchasers of one variety of Premium Saltines also avoids commonality problems as discussed *infra*. *See* Docket No. 176 at 4 n.2; Docket No. 156 at 10. Defendants' similar arguments as to varieties of Teddy Grahams can be deemed moot, given the Court's inclination to deny certification of any Teddy Grahams Subclass, discussed *infra*.

California, on or after February 11, 2006, the Roasted Vegetable variety of Ritz Crackers in packaging bearing the phrase "made with real vegetables."

*See* Docket No. 156 at 1-2; Docket No. 183 at 8. The Court would inquire at the hearing as to Defendants' views on the suggested end-dates, and whether they would argue that imposing end dates on the subclasses would change any of the analysis presented by either party in the briefing. As the Court currently understands it, subclass period end-dates would not have any effect on any of the arguments presented by the parties, except, as Plaintiffs intended, that the end-dates vitiate Defendants' argument that the proposed subclasses might include consumers who purchased the Products after the challenged labels were no longer in use. The Court would also inquire whether Defendants challenge Plaintiffs' calculations of the end-dates.

## II. Legal Standard

A class action lawsuit is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979). To depart from this general rule, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977) (internal quotations and citation omitted). As a result, the proponent of class treatment bears the burden of demonstrating that class certification is appropriate. *See In re N. Dist. of Cal., Dalkon Shield IUD Prod. Liab. Litig.*, 693 F.2d 847, 854 (9th Cir. 1982). Before certifying a class, the trial court must conduct a "rigorous analysis" to determine whether the party seeking certification has met the prerequisites of Rule 23 of the Federal Rules of Civil Procedure (hereinafter referred to as either "Rule 23" or "Fed. R. Civ. P. 23"). *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1233 (9th Cir. 1996); *Wal-Mart Stores, Inc. v Dukes*, 131 S. Ct. 2541, 2551 (2011). Rule 23 requires the party seeking certification to satisfy all four requirements of Rule 23(a) and at least one of the subparagraphs of Rule 23(b). *See Valentino*, 97 F.3d at 1234.

Rule 23(a) requires that the parties seeking certification show: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). In turn, Rule 23(b) dictates that a class action may be maintained only if all the prongs of Rule 23(a) are satisfied, and, if the class meets one of the requirements laid out in Rule 23(b) itself; here, because Plaintiffs seek damages, they seek certification pursuant to Rule 23(b)(3), where the Court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members, *and* that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[3] Fed. R. Civ. P. 23(b)(3) (emphasis added); *see* Docket No. 156 at 3. As the Supreme Court has recently articulated, "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores*, 131 S. Ct. at 2551. Instead, "[a] party seeking

---

[3] Rule 23(b)(3) also provides that matters pertinent to the "predominance" test include: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."

class certification must affirmatively demonstrate his compliance with the Rule–that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original). Thus, a district court's "rigorous analysis" will often "entail some overlap with the plaintiff's underlying claim[s, which] cannot be helped." *Id.*

Rule 23(c)(5) permits the class to be divided into subclasses "that are each treated as a class under this rule." Fed. R. Civ. P. 23(c)(5). Where Plaintiffs seek certification of subclasses, "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action. A failure to do so will either require the dismissal of the action with respect to the subclass or force the action to proceed with regard to the members of the subclass on an individual basis." *Betts v. Reliable Collection Agency*, 659 F.2d 1000, 1005 (9th Cir. 1981); *see also Gomez v. Rossi Concrete, Inc.*, 270 F.R.D. 579, 587 (S.D. Cal. 2010).

"[A]part from the explicit requirements of Rule 23(a), the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Wolph v. Acer Am. Corp.*, 272 F.R.D. 477, 482 (N.D. Cal. 2011). A class is sufficiently ascertainable if its members can be identified by reference to objective criteria. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 291, 299 (N.D. Cal. 2010). The proposed class "must 'be defined in such a way that anyone within it would have standing.'" *Burdick v. Union Sec. Ins. Co.*, 2009 U.S. Dist. LEXIS 121768 *10 (C.D. Cal. Dec. 9, 2009) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)). Thus, a proposed class that includes "non-harmed" class members "is both imprecise and overbroad." *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).

### III. Analysis

As an initial matter, the Court would inquire as to whether Plaintiffs seek certification as a 23(b)(2) class, should the Court deny certification (as it currently is inclined to do) as to any of the subclasses under 23(b)(3). In Plaintiffs' previous motion for class certification, they argued that the Court could alternatively certify the class, even one seeking monetary damages, under Rule 23(b)(2) since, they argued, monetary damages did not predominate over the injunctive relief sought; the Court was unsympathetic to this argument and would similarly reject the notion that *if* Plaintiffs seek damages, this class could be certified under anything other than 23(b)(3). *See* September Order at 15-16. However, in a footnote, Plaintiffs suggest that should the Court deny certification of a 23(b)(3) class, the Court should certify the class under 23(b)(2) as seeking *only* injunctive relief. *See* Docket No. 156 at 3, 32 n.17.[4] However, Kraft asserts that a suit for injunctive relief would be largely moot because Kraft no longer uses many of the labels challenged by Plaintiffs. *See* Docket No. 176 at 41. The Court would ask Plaintiffs to clarify as to whether they are truly seeking certification as an injunctive relief-only 23(b)(2) class as an alternative to 23(b)(3) certification, and would also ask both parties to state their views as to whether and why injunctive relief would be moot. This is an important issue because, as discussed below, the Court would find that while certification under 23(b)(2) might be warranted should Plaintiffs amend their class certification

---

[4] Plaintiffs state: "If despite Plaintiffs' arguments, the Court still finds the issue of damages so problematic as to preclude certification, Plaintiffs note that the injunctive relief they seek is equally important, very much in the public interest, and would urge that the Court certify a class (under Rule 23(b)(2) or 23(b)(3)) aimed at obtaining the injunctive relief sought in Plaintiffs' SAC." Docket No. 156 at 32 n.17.

motion to squarely seek certification under that provision, the ascertainability and predominance requirements preclude a 23(b)(3) certification.

### A. Ascertainability

This Court previously found that the proposed class was not sufficiently ascertainable because it "includes consumers who might not even have seen the allegedly misleading claims" and thus was "overbroad." *See* September Order at 9. In other words, since the proposed class had included consumers who had not suffered any injury, the class impermissibly included members who lacked standing. *See Burdick*, 2009 U.S. Dist. LEXIS 121768, at *10. Now, however, each of the subclasses is expressly defined so as to include only consumers who purchased products with the allegedly unlawful labels. Thus, the worry that the class is unascertainable by virtue of including members without standing has been sufficiently assuaged by Plaintiffs' more restrictive framing of the subclasses.

The Court remains, however, gravely concerned about ascertainability for a reason that also worried the Court in considering the initial class certification motion: even though the class has now been modified so as to facially include only consumers who saw the challenged labels on the Products, the Court fails to see how it will be - as it must be - "*administratively feasible* to determine whether a particular person is a class member." *See Chavez v. Blue Sky Natural Bev. Co.*, 268 F.R.D. 365, 376 (N.D. Cal. 2010) (emphasis added). This angle of the acsertainability question overlaps with the "manageability" prong of Rule 23(b)(3)(D), in which a court should consider whether a case will be manageable in assessing whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" as required in Rule 23(b)(3).

Kraft has directed the Court to authority indicating that where the court would have absolutely no way to verify that self-identified class members in fact suffered the alleged injury (or more to the point, that consumers themselves might not be able to honestly identify themselves even with proper notice), class certification is improper. *See, e.g., Hodes v. Van's Int'l Foods*, No. 09-1530, U.S. Dist. LEXIS 72193, at *11 (C.D. Cal. July 23, 2009) (case not manageable under 23(b)(3) because "the Court has concerns about how Plaintiffs will identify each class member and prove which brand of Van's frozen waffles each member purchased, in what quantity, and for what purpose. The likelihood that tens of thousands of class members saved their receipts as proof of their purchase of Van's waffles is very low"); *True v. Conagra Foods, Inc.*, No. 07-00770-CV-W-DW, 2011 U.S. Dist. LEXIS 6770, *15-16 (W.D. Mo. Jan. 4, 2011) (finding that common factual questions would not predominate, as required under 23(b)(3), because "it is also highly likely that only a few - if any - putative members retained tangible evidence of their purchase (*i.e.*, a receipt or the actual pot pie); consequently, this class is also problematic because it would be based on the vagaries of memory.'"); *Deitz v. Comcast Corp.*, No. C 06-06352 WHA, 2007 U.S. Dist. LEXIS 53188, at *25 (N.D. Cal. July 11, 2007) (proposed 23(b)(3) class not ascertainable because "[t]here would be no easy way to determine which subscribers owned a cable-ready television during the relevant class period").

Cases where self-identification alone has been deemed sufficient to render a class ascertainable generally involve situations where consumers are likely to have retained receipts (*see Bush v. Calloway Consol. Grp. River City, Inc.*, No. 3:10-cv-841-J-37MCR, 2012 U.S. Dist. LEXIS 40450, at *16-18 (M.D. Fla. Mar. 26, 2012)), where the relevant purchase was a memorable big-

ticket item (*see Parkinson v. Hyundai Motor Am.*, 258 F.R.D. 580, 594 (C.D. Cal. 2008)), or where the defendant would have access to a master list of either consumers or retailers who dealt with the items at issue (*see Galvan v. KDI Distrib., Inc.*, No. 08-999, 2011 U.S. Dist. LEXIS 127602, at * 11 (C.D. Cal. Oct. 25, 2011)).[5] The sole case relied upon by Plaintiffs for the notion that a class where the members will need to identify themselves, will need to rely on their own memory of purchasing a small, everyday item, will need to remember that the item in question had a particular label, *and* will not be able to provide any written proof of purchase is *Zeisel v. Diamond Food, Inc.*, No. C 10-01192 JSW, 2011 U.S. Dist. LEXIS 60608 (N.D. Cal. June 7, 2011). As Defendants note, the reasoning of *Zeisel* relies upon cases involving big-ticket items or cases where there were no nuanced labeling issues involved (*see id.* at *21-23); the Court would thus decline to find that the proposed subclasses here are ascertainable on the basis of this sole factually apposite legal authority.

Whether analyzed under the implied ascertainability requirement,[6] or, the superiority requirement of 23(b)(3) as informed by the manageability component imparted in 23(b)(3)(D), the issue of whether class members will be able to identify themselves to the Court in any even remotely verifiable way remains a significant legal and practical hurdle for Plaintiffs' certification motion under 23(b)(3). The Court would invite Plaintiffs to present arguments as to this point at the hearing.

A lack of ascertainability alone will generally not scuttle class certification. *See Galvan v. KDI Distrib.*, 2011 U.S. Dist. LEXIS 127602, 15-16 (C.D. Cal. Oct. 25, 2011) ("the class definition may include individuals who . . . have inadequate proof to go forward with the class. However, these ascertainability issues are not fatal to class certification and may be addressed later in the litigation"). Nevertheless, manageability is a consideration taken into account in assessing whether common questions of fact or law predominate, which the Court must find to be met before certifying a 23(b)(3) class. *See* Fed. R. Civ. P. 23(b)(3)(D). Thus, the Court is inclined to deny class certification on this basis, though will continue to assess the parties' arguments as to whether the remaining Rule 23 factors have been met.

    B. <u>23(a) Factors</u>
        1) <u>Numerosity</u>

Defendants do not dispute that each of the subclasses likely meet the numerosity requirement. Thus, the Court will consider Plaintiffs to have met presented sufficient evidence to meet this prong of the Rule 23 analysis in their assertion that "common sense dictates that more than 40 Californians" purchased each product within the designated time period. *See* Docket No. 156 at 6; *see also Ikonen v. Hartz Mountain Corp.*, 122 F.R.D. 258, 262 (S.D. Cal. 1988) ("classes of 40 or

---

[5] The Court would note that it has not relied upon the case submitted by Defendants on April 6, 2012 as "Supplemental Authority in Support of its Opposition to Plaintiffs' Renewed Motion for Class Certification" (*see* Docket No. 210), since that case (*Williams v. Oberon Media*, No. 10-56255, 2012 U.S. App. LEXIS 3453 (9th Cir. 2012)) is a Ninth Circuit memorandum opinion that was not selected for publication, and thus has no precedential value. *See* 9th Cir. R. 36-3 ("Unpublished dispositions and orders of this Court are not precedent, except when relevant under the doctrine of law of the case or rules of claim preclusion or issue preclusion").

[6] This is a serious issue because a lack of ascertainability will lead to "the inability for future courts to ascertain who was and was not bound by the judgment. If the class definition depends criteria that are not readily ascertainable, it would be nearly impossible to determine who was actually included an appropriate class member." *Deitz*, 2007 U.S. Dist. LEXIS 53188, at *25.

more are numerous enough").

                      2) <u>Commonality under both 23(a)(2) and 23(b)(3)</u>

Rule 23(a)(2) requires that there be "questions of law or fact [which are] common to the class." Although there must be common questions of law or fact, it is not necessary that all questions of law or fact be common. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) ("The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class"); *see also Staton v. Boeing Co.*, 327 F.3d 938, 953-57 (9th Cir. 2003). In *Wal-Mart Stores*, the Supreme Court instructed that in order to satisfy the commonality requirement of 23(a)(2), plaintiffs must demonstrate that their claims "depend upon a common contention" that is "capable of classwide resolution - which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." 131 S.Ct. at 2551.

For each subclass, Plaintiffs have identified the following common questions:

> (1) whether Kraft communicated a representation through the product's packaging that the product is healthier than it actually is; (2) whether the representation was material to a reasonable consumer; (3) whether the representation was false or misleading; (4) whether Kraft concealed material information from class members; and (5) the proper method for calculating the Class's damages and proper scope of injunctive relief.

*See* Docket No. 156 at 7.

A brief summary of the legal claims involved in this case will be useful in assessing the parties' arguments as to commonality. Plaintiffs invoke three consumer protection laws: (1) California Unfair Competition Law ("UCL"); (2) California's False Advertising Law ("FAL"), and (3) the federal Consumer Legal Remedies Act ("CLRA"). With regards to the UCL and FAL claims, while the claims sound in fraud which would generally require Plaintiffs to prove the element of reliance, plaintiffs under these statutes need not prove that each individual class member relied upon the allegedly fraudulent misrepresentations. Instead the California Supreme Court has held that "it is necessary only to show that members of the public are likely to be deceived." *In re Tobacco II Cases*, 46 Cal.4th 298, 312 (2009); *Stearns v. Ticketmaster Corp.* 655 F.3d 1013, 1020-01 (9th Cir. 2011). As such, UCL and FAL plaintiffs must show only that a "reasonable consumer" is likely to have been deceived by the challenged business practices or advertising. *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir.1995). Thus, as to Plaintiffs' FAL and UCL claims, Kraft's arguments that some class members might not have relied on the alleged misrepresentations has no bearing on whether common contentions can resolve their claims, as individual reliance need not be shown. *See* Docket No. 176 at 26 (arguing that "someone who bought [the Product] solely because she enjoyed the taste did not suffer the same harm as someone who purportedly thought that the snacks were healthful").

As for Plaintiffs' CLRA claims, while individualized reliance (*i.e.* causation) is an element of a CLRA claim (in contrast to UCL and FAL claims), if there have been material misrepresentations made to the entire class, then the Court will infer a presumption of reliance as to the class, and individualized causation need not be shown. *In re Vioxx Class Cases*, 180 Cal.App.4th 116, 129 (2009); *Stearns*, 655 F.3d at 1022. An alleged misrepresentation is

material:
> if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question, and as such materiality is generally a question of fact unless the fact misrepresented is so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by it.

*Stearns*, 655 F.3d at 1022. Thus, if Plaintiffs can show that the alleged misrepresentations were material, then they need not show individualized reliance to prevail in their CLRA claims. Adding all of this together, as described above, certification cannot be defeated by assertions that reliance would need to be proven as to each class member as to the FAL and UCL claims. However, as to the CLRA claims, *if* the alleged misrepresentations are not found to be material, *then* individualized reliance must be proven, and Rule 23's requirement of commonality will not be met.

Yet the issue of whether the alleged misrepresentations are material is not suitable for adjudication at the class certification stage, because whether each alleged misrepresentation is material is a question of fact "to be determined at a later stage . . . [the argument that because the purported misrepresentations were not material and thus no presumption of reliance arises] is not sufficient to defeat class certification." *Johns v. Bayer Corp.*, No. 09cv1935 AJB (POR), 2012 U.S. Dist. LEXIS 13410, at *16-17 (S.D. Cal. Feb. 3, 2012); *Zeisel*, 2011 U.S. Dist. LEXIS 60608, at *34 (finding that class certification is warranted because "the issue of materiality can be established by common proof"). Defendants, instead of arguing that materiality cannot be established *on a classwide basis*, which is the appropriate inquiry at this stage, engage in a lengthy discussion of the merits of the materiality issue, citing cases where various alleged misrepresentations were found not to be material. *See* Docket No. 176 at 34.[7] Indeed, at least as to the subclasses that only involve one product and one challenged label, it is hard to see how the question of whether "a reasonable man would attach importance to its existence or nonexistence in determining" whether or not to purchase the product would be anything other than a common question of fact to be proven on a classwide basis. *See Stearns*, 655 F.3d at 1022. Defendants' argument that members of each subclass "have not been exposed to uniform misrepresentations" (*see* Docket No. 176 at 31) is simply inaccurate, given that Plaintiffs only challenge one label as used on one product, in each subclass (at least, in each subclass that the Court would consider certifying).

In sum, the Court would not presently resolve the issue of materiality, but would note that if the alleged misrepresentations are shown at the summary judgment stage or at trial to not be material, then the Court would decertify the class as to the CLRA claim at that time.[8]

---

[7] The Court would note, however, without deciding, that Plaintiffs have made a sufficient threshold showing of materiality, in isolating numerous documents produced by Kraft indicating that health labeling like the challenged labels is likely to influence the purchasing decisions of the average consumer (*see* Docket No. 156 at 25); while Plaintiffs have not even come close to decisively proving the materiality issue, that is not their burden at the present procedural juncture.

[8] Further, the Court would note that were the CLRA claims dismissed, the parties would then be ordered to show cause as to subject matter jurisdiction, as the CAFA requirements of diversity and amount in controversy would become less obviously met. *See* SAC ¶ 2; 28 U.S.C. 1332(d)(2).

### a) 23(a)(2) Commonality is Met

Previously, this Court found that the issue of 23(a)(2) commonality was "somewhat of a close call" and ultimately was not met because of the unified class involving "a wide range of products and product labeling claims."[9] *See* September Order at 10. The creation of subclasses has alleviated this particular worry, as each subclass no longer encompasses a wide-range of products or labels. Indeed, the five above-listed interrelated questions, when answered will be "central to the validity of each one of the [class members'] claims in one stroke." *Wal-Mart Stores*, 131 S. Ct. at 2551. Defendant has objected that even though each subclass now involves one or relatively few products and one or relatively few labels, the subclasses fail to meet the commonality requirement because the plaintiffs have suffered different injuries based on their differing reasons for buying the product. *See* Docket No. 176 at 26, 29. The Court would reject this argument; the question of whether Plaintiffs have suffered a common injury does not rest on whether they are upset about the injury for the same reasons, but instead, whether liability for a common injury can by resolving the same factual and legal allegations, is claimed by each class member. Indeed, the Court rejected such arguments in the previous certification ruling. *See* September Order at 11. Here, as has been found in many other cases, the Court would find that the 23(b)(2) commonality requirement is met as to each subclass because each subclass member has purchased the same item that allegedly violates the law due to the same labeling or characteristics. *See, e.g., In re Ferrero Litig.*, No. 11-CV-205 H (CAB), 2011 U.S. Dist. LEXIS 131533, at *10-11 (S.D. Cal. Nov. 14, 2011) ("the claims made on behalf of the proposed class are based on a common advertising campaign, and include common questions such as whether Ferrero's advertising campaign misrepresented that Nutella® is healthier or more nutritious than it actually is, *or* makes a more significant contribution to a balanced breakfast than it actually does, including for children. Thus, Rule 23(a)(2)'s commonality requirement is satisfied") (emphasis added); *Tylka v. Gerber Prods. Co.*, 178 F.R.D. 493, 497 (N.D. Ill. 1998)("the presence of some factual variations among class members' experiences will not defeat class certification . . . . Moreover, that Gerber ran various ads on television and in print, does not alter Plaintiffs' central claim that the advertisements were designed to deceive consumers") (citations omitted).

In sum, the Court would find that in this renewed motion for class certification, Plaintiffs proposed subclasses meet 23(a)(2) commonality.

### b) The proposed class does not meet the requirement in 23(b)(3) that common questions of fact or law predominate.

As this case is brought under Rule 23(b)(3), the Court must also assess whether common questions *predominate* over individualized issues, a "far more demanding" test than the commonality requirement of 23(a)(2). *Amchem Prods. v. Windsor*, 521 U.S. 591, 624 (1997). Defendants raise

---

[9] To the extent that Defendants characterize the September Order as finding "too abstract" the question of whether Kraft's labeling was so misleading as to deceive a reasonable customer, the Court would note that this is a misreading; the Order goes on to explain that such question was only too abstract because the then-proposed national, unified class "consist[ed] of millions of consumers who purchased different products bearing different labels over the span of a decade." Now, the subclasses are divided by product, they bear either the same or substantially similar labels, and the time period has been restricted. Concerns over abstraction are thus alleviated in this renewed motion for class certification.

four well-taken points as to the predominance issue: 1) some of the subclasses still contain numerous products such that common facts and legal contentions would not resolve the subclass members' claims; 2) some of the subclasses still contain numerous labels such that common facts and legal contentions would not resolve the subclass members' claims; 3) some of the subclasses involve products where the challenged labeling was not always used during the claims period, and thus common facts cannot resolve the claim members' contentions; and 4) individualized issues of damages preclude a finding that common questions of fact or law predominate. The Court has serious concerns as to whether these four concerns could vitiate Plaintiff's ability to meet the predominance requirement, and would enquire closely at the hearing as to each. Based on the parties' briefs, however, the Court would only find that the fourth argument, namely that individualized damages issues precludes a finding of predominance here, has sufficient weight to warrant a denial of certification as to each subclass.

       First, Defendants argue that some of the subclasses still involve numerous products. This argument only pertains to the Teddy Grahams and Ritz I subclasses, as the five other classes only include one product. Moreover, because the Teddy Grahams subclass contains more than one product only insofar as the container size, this difference is not of sufficient import to threaten a predominance finding. The Ritz I subclass is more worrying, in particular because the variations of Ritz crackers in the subclass, which includes varieties such as, "Reduced Fat, Whole Wheat, Hint of Salt, or Low Sodium." Considering Plaintiffs' claims are, in essence, that Kraft fraudulently claimed that these snacks were "sensible" when they were not, the legal and factual underpinnings of claims related to each of these variations would seem to differ. Plaintiffs aver that this is not the case, as the ingredients rendering the "sensible" appellation fraudulent are the same as amongst the varieties (*see* Docket No. 156 at 12). The Court would find that four different products (along with two different labels, thus potentially eight different permutations) is too many to be included in one subclass. Thus, the Court would find that the predominance requirement is not met as to the Ritz I subclass, and the Court would DENY certification as to that particular subclass on that basis.

       Second, Defendants argue that the subclasses each challenge as unlawful multiple labels. The Court would note as an initial matter that this argument only pertains to the Teddy Grahams and Honey Maid subclasses, as the other five classes involve either only one label or the labels "sensible snacking" and "sensible solution," which are sufficiently similar that the Court cannot imagine Kraft to argue that different legal and factual questions would resolve the merits of Plaintiffs' claims as to one as distinct from the other. Most problematic here is the Teddy Grahams subclass, which challenges four labels: "sensible snacking," "sensible solution," "smart choices," or "help support kids' growth and development." Evaluating whether the latter three labels violate the invoked consumer protection laws would rest upon different factual and legal contentions, since whether or not each label is a misrepresentation is a distinct inquiry. Moreover, it could be that one label is found to be a "material" misrepresentation, while another is not. Thus, common questions could not resolve the claims of all the members of the Teddy Grahams Subclass. Therefore, the Court would deny certification as to the Teddy Grahams subclass, due to the variations in challenged labels and concomitant failure of common questions of fact or law to predominate as to that subclass. As to the Honey Maid Subclass, in addition to the sensible snacking/solution label, Plaintiffs also challenge the use of "wholesome." Since evaluating this label would undoubtedly involve distinct questions as compared to "sensible snacking/solution," the Court would inquire whether there would

need to be a narrowing of the class definition to exclude the "wholesome" claim or the "sensible solution/snacking" claims.

Third, and more tenuously, Kraft argues that because the challenged *words* (i.e. "sensible solution") were used on a number of different *package designs* even as to each individual product, the claims of even a subclass with one product and one challenged verbiage could not be resolved by common questions of fact or law. *See* Docket No. 176 at 5-7, 31. There is ample caselaw finding predominance to be met where companies convey *one* allegedly fraudulent *message* (such as those challenged in each subclass here: "sensible solutions" or "made with real vegetables") by a *multiplicity* of *means* such as television and print ads, and product labeling. *See, e.g., Johnson v. Gen. Mills, Inc.*, 275 F.R.D. 282, 288 (C.D. Cal. 2011) ("common issues underlying [Plaintiffs'] UCL and CLRA claims predominate [because] the central issues raised by this suit concern an allegedly overriding, material misrepresentation that YoPlus promotes digestive health in a way that ordinary yogurt does not. According to [Plaintiff], this misrepresentation was communicated by the packaging of YoPlus and further amplified by General Mills' marketing including television, newspaper, magazine, and internet advertisements"); *In re Ferrero Litig.*, 2011 U.S. Dist. LEXIS 131533, at *16 (finding predominance met despite multiplicity of packaging because "all of the class members' claims share a common contention: namely, that Defendant made a material misrepresentation regarding the nutritious benefits of Nutella® that violated the UCL, FAL and the CLRA"); *Wiener v. Dannon Co.*, 255 F.R.D. 658, 671 (C.D. Cal. 2009) (finding predominance, and materiality, met because "[r]egardless of whether every class member was exposed to Dannon's television, print, and internet advertisements, the record clearly establishes that Dannon's alleged misrepresentations regarding the clinically proven health benefits of the Products are prominently displayed on all of the Products' packaging, a fact that Dannon has never contested); *Bruno v. Quten Res. Inst., LLC*, 2011 U.S. Dist. LEXIS 132323, at *32-34 (finding predominance met despite a variety of products, packaging and label phrasing because "the central predominating question is whether Defendants' marketing statements about 'up to 6X BETTER ABSORPTION' or 'effectiveness' is materially misleading"); *Wolph*, 272 F.R.D. at 488 (finding predominance met because allegedly fraudulent representations on packaging "were communicated to all class members because they were shown at the point of purchase").[10] In contrast, Defendants have provided the Court with no cases holding that predominance is not met simply because the allegedly fraudulent label is used in more than one variety of packaging.[11] In sum, despite the fact that there are multiple

---

[10] The Court would note that while we ultimately should find that Plaintiffs have not shown predominance here, it would be manifestly unjust for the Court to make such a finding based on the fact that a company simply by failing to use the allegedly fraudulent label for an extended period of time or by periodically making minor changes to the packaging design containing the challenged label.

[11] Kraft's arguments that the class should not be certified because some of the packaging during the subclass periods did not bear the allegedly fraudulent misrepresentations misses the mark; if a consumer purchased a Product that did not bear the challenged labeling, that consumer would simply not be a member of the class in the first instance. Thus, while couched as an argument that the commonality and predominance requirement is not met, Kraft's assertion that some of the packaging omitted the challenged labeling is really a re-framing of the ascertainability and manageability arguments discussed above, where potential class members receiving notice of the suit will be hard-pressed to know whether or not they suffered the complained-of injuries or not. Another way to view this argument is as an issue of damages, not liability; if Kraft is correct in asserting that only some of their

packaging designs at issue here, the Court would find that the predominance requirement is met because a contention common that predominates the resolution of all of the class members' claims, irrespective of packaging, is a finding that the one phrase challenged by each subclass constitutes a fraudulent misrepresentation likely to deceive a reasonable consumer.

Fourth, Defendants raise the argument that individualized damages issues should preclude a finding that common issues of fact and law predominate. *See* Docket No. 176 at 36. At the class certification stage, Plaintiffs' burden is to show that "restitution can be calculated by methods of common proof." *In re Google Adwords Litig.*, No. 08-CV-3369-EJD, 2012 U.S. Dist. LEXIS 1216, at *51 (N.D. Cal. Apr. 1, 2011). Under the UCL, the Court "has the inherent power to order, as a form of ancillary relief, that the defendants make or offer to make restitution to the customers found to have been defrauded." *People v. Sup. Ct.*, 9 Cal.3d 283, 286 (1973) (Mosk, J.). Once unlawful conduct has been proven under the FAL or UCL, in order to effectuate a "deterrent force," "a class action may proceed, in the absence of individualized proof of lack of knowledge of the fraud[.]" *Fletcher v. Sec. Pac. Nat'l Bank*, 23 Cal.3d 442, 451 (1979); *Gutierrez v. Wells Fargo Bank, N.A.*, 730 F.Supp.2d 1080, 1138 (N.D. Cal. 2010). Plaintiffs propose two methods for calculating damages, and the Court will consider each in turn. Initially, Plaintiffs propose that Kraft disgorge all of the profits earned from sales of the Products during the subclass periods. *See* Docket No. 156 at 28-29. While not expressly addressed by the California Supreme Court in the specific context of a class action, courts have generally found that "*nonrestitutionary* disgorgement is not an available remedy in a UCL class action." *Madrid v. Perot Sys. Corp.*, 130 Cal.App.4th 440, 460 (2005) (emphasis in original); *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal.App.4th 997, 1018 (2005) ("nonrestitutionary relief is unavailable in class actions brought under the UCL"); *see also Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1167 (2003) (holding that nonrestitutionary disgorgement is not permitted under the UCL as to individual actions, but leaving open the question of whether such a remedy would be authorized in class action suits). The Court thus cannot approve Plaintiffs' proposal that Kraft disgorge the full profits earned from sales of the Products within the class period, as Plaintiffs undeniably received some benefit from the Products and thus awarding class members full refunds on their purchases would constitute nonrestitutionary disgorgement. Additionally, there would be a large portion of the sales which would not be tainted by any alleged misrepresentations due to customer loyalty and other factors on which sales of the Products would be based.

Plaintiffs' second proposal is that Kraft pay restitution to the class members, calculated "as the premium charged for offending products labeled with misleading health and wellness claims compared to the same products before such claims were employed." *See* Docket No. 156 at 31. Plaintiffs aver that when merits discovery moves forward (as opposed to only certification discovery, as this Court has permitted so far), Kraft records will allow them to calculate damages according to this method with some degree of accuracy, on a class-wide basis.[12] Plaintiffs' suggested damages

---

packaging permutations bore the allegedly fraudulent label, this cannot defeat certification of the class of consumers who did purchase the fraudulently labeled items, but instead speaks to the extent of liability faced by Kraft if indeed the challenged labels are found fraudulent.

[12] The Court would note that Kraft mischaracterizes Plaintiffs' second damages proposal. Kraft states: "Plaintiffs propose that putative class members be reimbursed for the difference between what they paid for the

calculations here presuppose that the Products bearing the challenged labels were more expensive than those without it, such that individual purchasers suffered an injury with each purchase in that they paid a premium for a supposed benefit that allegedly was absent from the product.[13] While the amount of such a premium might be established on a class-wide basis, Plaintiffs cannot get around the fact that individual class members,to recover, would need to show, at minimum, proof of how many purchases they made of the offending products, where and when, in order to discern how many multiples of that premium they are owed. While this method has been approved in a few analogous class actions (see, e.g., *Wiener*, 255 F.R.D. at 670; *Chavez*, 268 F.R.D. at 379), memory issues as to what products were purchased where and in what quantities, as well as price differences at the vast array of retail establishments that sell the Products render this Court unwilling to find that common questions of law or fact will predominate as to the resolution of class members' claims, due to the individualized nature of the damages calculations. In fact, courts within this Circuit have held that similar methods of calculating damages are too onerously fact-intensive to be consistent with the predominance or manageability requirements. See *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990) ("When a class action involves a large number of class members but only a small individual recovery, the cost of separately proving and distributing each class member's damages may so outweigh the potential recovery that the class action becomes unfeasible."); *Harris v. Vector Mktg. Corp.*, 753 F.Supp. 2d 996, 1023.[14]

---

snacks and the lesser amount that they 'would have been willing to pay' if the snacks did not contain the challenged representations." *See* Docket No. 176 at 38. The quoted language, purportedly drawn from Plaintiffs' briefing, is accompanied by no page number, and the Court was unable to locate such language. This is likely because Plaintiffs do not propose any such reimbusement calculations; instead, Plaintiffs propose that damages be calculated based on the difference between the price Kraft charged for the Products without the challenged labels, and the price Kraft charged for the Products bearing such labels. What various individuals "would have paid" is not a part of Plaintiffs' second proposal. Thus, this case is not quite on all fours with *In re Google Adwords Litig.*, relied upon by Defendants, a class action challenging Google's advertisement pricing, where the Court found that "any effort to determine what advertisers 'would have paid' under a different set of circumstances requires a complex and highly individualized analysis of advertiser behavior for each particular ad that was placed." 2012 U.S. Dist. LEXIS 1216, at *47.

[13] Plaintiffs offer the following further detail on their proposed damages calculation method:
> We use a hypothetical example to illustrate the principle. Imagine that a one pound box of Original Premium Saltines in packaging with no health and wellness labeling sold for an MSRP of $1.29 in 2002, and an MSRP of $2.69 in 2008, labeled with a "Sensible Snacking" claim.15 Using inflation data from the Statistical Abstracts of the United States, the expected cost of $1.29 2002 Saltines in 2008 would be $1.54. Thus, an MSRP of $2.69 would represent a $1.15 premium, which would be multiplied by the number of units sold during the relevant period16 (again, according to Kraft records) to determine the appropriate restitution for the Class. To the extent Kraft argues that other factors are included in the apparent premium (for example, increases in the cost of goods sold), if proven, those can be also be calculated, isolated, and subtracted. This type of calculation may, of course, require expert analysis, but it is relatively commonplace, and expert testimony is itself common, class-wide evidence.

See Docket No. 156 at 31-32.

[14] As noted by Kraft, at the previous class certification hearing (though not in the subsequently issued opinion denying class certification), the Court was troubled by Plaintiffs' lack of a feasible damages calculation

-13-

In sum, the Court would find that while 23(a)(2) commonality is met, the 23(b)(3) predominance requirement is not met due to concerns regarding manageability and the inevitability of individualized damages calculations. Thus, the Court would not at this time certify any of the Subclasses as a 23(b)(3) class, though the Court would seek further elucidation from Plaintiffs at the hearing regarding their proposed methods of calculating damages.[15] Given that the Court finds that 23(a)(2) commonality is met, however, the Court will continue to assess the other requirements of 23(a), in the event Plaintiffs amend the Complaint so as to seek certification under 23(b)(2).[16]

### 3. Typicality

Typicality requires a determination as to whether the named plaintiffs' claims are typical of the class she seeks to represent. Fed. R. Civ. P. 23(a)(3). To satisfy typicality, a class representative must "possess the same interest and suffer the same injury as the class members," *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982), such that the evidence needed to prove the named plaintiff's claim is probative of the other class members' claims. *Wiener*, 255 F.R.D. at 665-66. Typicality may be found lacking "if there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." *Hanon v. Dataproducts Corn*, 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotes omitted).

The Court's previous ruling in denying class certification here found that "[t]ypicality is probably satisfied," and disposed of many of the same arguments Defendants raise again in their briefing on the instant motion. September Order at 11-13. However, the Court expressed concern that the named Plaintiffs were not typical of the purported class because they bought the Products before the challenged labels were used on the packaging, and they continued to buy the products after the lawsuit was filed and they thus allegedly had knowledge that the representations were false.[17]

---

method. *See* Docket No. 176, Exh. 60 at 21-28 (transcript of hearing). However, Kraft omitted citing the portion of the transcript where the Court expressed some optimism that the creation of subclasses could simplify the damages issue: "Let me just ask Defense counsel: If they were to divide the class certification into subclasses based on individual products, what would be the problem there?" *Id.* at 28.

[15] The Court previously rejected Kraft's argument that commonality is not met because they plan to raise a statute of limitations defense; the Court will not now reconsider it. *See* September Order at 15.

[16] The Court will not, however, proceed to assess the "superiority" requirement of 23(b)(3), given that the Court would find certification under that provision precluded by virtue of the predominance requirement not being met. *See* Fed. R. Civ. P. 23(b)(3) (permitting certification if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, *and* that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy") (emphasis added).

[17] Kraft also argues that Plaintiffs are not typical of the class and cannot adequately represent the class because they purchase and consume other foods with the same ingredients they allege to be unhealthy in this suit. *See* Docket No. 176 at 42 (arguing Plaintiffs lack typicality because they purchase other foods that contain the ingredients they allege in the SAC to be unhealthy). This argument is wholly irrelevant; the claims here turn on whether *Kraft's particular statements as to particular products* were false or fraudulent such that Plaintiffs were injured; whether Plaintiffs purchased other products that may or may not have involved any representations at all about healthfulness does not bear on any of the elements of the purported class claims. Plaintiff's other purchasing decisions will only be relevant as to the issue of individual reliance, which, as discussed above, will not need to be proven at all, because it is not an element for the UCL and FAL claims, and the class will need to be decertified as to

*See id.* at 12. Plaintiffs argued in their renewed motion that the Court erred in speaking in the plural when discussing post-filing purchases of the Products, and claim that the only instance where either plaintiff purchased any of the Products after the filing of the suit was when Whitt purchased a box of Honey Maid Grahams on one isolated occasion. *See* Docket No. 156 at 13. The Court would find that this single purchase does not render the named representatives impermissibly atypical for two reasons proposed by Plaintiffs. First, from a procedural perspective, Plaintiff Red did not purchase Honey Maid Grahams after filing suit, thus she can serve as the representative for that particular subclass. Second, crucially, in order to state a claim under the UCL, the challenged label need only be a "substantial factor" in Plaintiff's purchasing decision. *In re Tobacco II Cases*, 46 Cal.4th at 326-27. That is not to say that the allegations of Plaintiff Whitt's post-filing purchases are irrelevant; in fact, the Court would note without deciding that such post-filing purchases lend credence to Kraft's theory that if the challenged labels were even misrepresentations, they were not *material* misrepresentations that would influence a reasonable consumer's purchasing decisions. However, as discussed above, the class certification stage is not the appropriate time for the disposition of the materiality issue.

### 4. Adequate representation

Rule 23(a)(4) permits the certification of a class action only if "the representative parties will fairly and adequately protect the interests of the class. To determine whether the representation meets this standard, we ask two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton*, 327 F.3d at 957 (quotations and citations omitted). Here, there have not been any conflicts of interests alleged, thus the first prong of this test is met. Defendants have challenged the representation of the absent class members as inadequate under two grounds: first, Kraft challenges the named Plaintiffs' ability to represent the interests of the absent class member (essentially arguing that this is a lawyer-driven suit), and second, Kraft questions the ability of the Weston Firm to represent the class with the requisite resources, expertise and propriety. The Court will address each of these arguments in turn, and finds them to be close questions, but ultimately of insufficiently weight to justify a denial of class certification by themselves.

First, Defendants argue that class representatives Red and Whitt are impermissibly unfamiliar with the case. This Court previously found that "there is at least some basis for concern" that the named Plaintiffs were not sufficiently well-informed to prevent the suit from being "controlled entirely" by the attorneys, exactly the worry that the adequate representation requirement was intended to foreclose. *See* September Order at 14; *Beck v. Status Game Corp.*, No. 89 Civ. 2923 (DNE), 1995 U.S. Dist. LEXIS 9978, at *12 (S.D.N.Y. July 13, 1995) (quoting 7A Wright & Miller § 1766 (2d ed. 1986)). Of the most concern to the Court is Plaintiff Red's statement at her deposition that she was unaware of the differences between the complaint as originally filed and as amended in the SAC. *See* Docket No. 176, Exh. 60 at 112-13 ("Q: Do you understand that there is a difference between the original complaint that you filed and the second amended complaint that

---

the CLRA claims if there is a finding that the misrepresentations were not material and thus that individual reliance must be proven.

you filed? A: Not really . . . I don't know the difference.").[18] Another concern is that Whitt was apparently unaware that the Beck & Lee law firm was hired and then fired as co-counsel. *See* Docket No. 167, Exh. 61 at 156. However, the Ninth Circuit has set a low bar for the level of knowledge required of class representatives, and a named plaintiff can be an adequate representative if he merely "understands his duties and is currently willing and able to perform them. The Rule does not require more." *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). Therefore, while the Court would not presently deny certification on account of Red and Whitt's limited involvement in the case, the Court would caution Plaintiffs' counsel that they must include, involve and respect the class representatives sufficiently if the case moves forward such that Red and Whitt are able to discharge their duties in conformance with Rule 23.

      Second, this Court previously found that the adequacy of Plaintiffs' counsel was highly questionable for a number of reasons, noting that "Plaintiffs have failed to make the necessary showing that their counsel have the resources necessary to commit to representing the class." September Order at 14; s*ee* Fed. R. Civ. P. 23(g)(1)(A)(iv). Given the small size of the Weston firm (*see* Docket No. 158 ¶¶ 44-45), which shall not be recounted in detail given that the relevant portions of the Weston Declaration were filed under seal and redacted, the Court still has significant doubts that the Weston firm will be able to handle a litigation of this size and complexity. The Marron firm is similarly small, thus even assuming a high level of involvement in the case, the Court's worries are still not fully assuaged, particularly as the Marron declaration details the many other (surely complex) suits for which these two firms are co-counsel and which will likely consume resources. *See* Docket No. 159 ¶¶ 11, 14. However, the addition of Milstein Adelman as yet another co-counsel (*see* Docket No. 154) renders the Court inclined to find that these three firms together will be able to find the resources needed to prosecute this case vigorously and diligently for their clients.[19] Given that the Weston and Marron firms, together as co-counsel, have been approved as class counsel in a slew of recent class certifications in this district, the Court is sufficiently convinced of their ability to adequately represent the class. *See* Docket No. 158, 4-10.

      As a separate issue, while considering Plaintiffs' previous class certification motion, the Court found that it "would have an obligation to the putative class to fully investigate" allegations launched by former co-counsel Beck & Lee of impropriety on the part of the Weston firm. September Order at 14. The Court has now considered the detailed description of the Beck & Lee/Weston Firm dispute provided in Gregory Weston's declaration, and is inclined to find the accusations sufficiently groundless, and would not preclude the appointment of the Weston Firm as

---

[18] At least one of Kraft's assertions as to Red and Whitt's lack of involvement ignores the nuances of the deposition testimony on which it relies. *Compare* Docket No 176 at 42 *with id.* at Exh. 60 at 80 (quoting language where Red said she did not understand what it meant to be a class representative, failing to include testimony regarding her prior service as a class representative in another case involving allegations similar to those pled in the instant matter).

[19] The Court would recommend, though not require, that these three firms either arrange a fee allocation in writing early on in the litigation, or periodically address this issue or any other potentially contentious matter that might arise when there are three firms who must collaborate in a complex contingency suit, so as to avoid an endgame squabble amongst Plaintiffs' counsel over any potential settlement award or judgment in the Plaintiffs' favor.

class counsel. *See* Docket No. 158 ¶¶ 11-43. Other courts have similarly considered such accusations sufficiently baseless so as not to preclude appointing the Weston Firm as class counsel.

All in all, for the foregoing reasons, the Court would find that all of the requirements of 23(a) are generally met, yet, the requirements of 23(b)(3) are not. The Court would thus DENY certification of any of the Subclasses as 23(b)(3) subclasses, as sought by Plaintiffs, but would permit leave to amend the Complaint so as to seek only injunctive relief via a 23(b)(2) class.

### C. Kivetz Declaration

Plaintiffs have submitted a motion to strike or exclude the expert testimony submitted by Defendants in support of their opposition to the renewed class certification motion. *See* Docket No. 199. The Court read and considered the Kivetz Declaration in its evaluation of the class certification motion. Since the Kivetz Declaration did not significantly affect the Court's analysis; the Court would find Plaintiff's motion to strike the declaration moot. If Defendants seek to use the Declaration in support of further motions and proceedings in this case, the Court would invite Plaintiffs to seek consideration of their motion at that point.[20]

### III. Conclusion

In sum, the Court would DENY certification of any of the Subclasses pursuant to 23(b)(3). The Court would nonetheless permit Plaintiffs leave to amend the motion for class certification to seek injunctive relief only, pursuant to 23(b)(2). The Could would nonetheless question counsel at the hearing as to the following issues, which are the closest questions in the foregoing analysis:

- How would class members be able to self-identify accurately, such that the class is ascertainable?
- Is the damages calculation method suggested by Plaintiffs in their second proposal (*see* Docket No. 156 at 30-33) feasible, or would it render the case unmanageable?
- Have the class representatives been sufficiently well-informed that they can adequately represent the class?
- Do Defendants object to the subclass period end-dates proposed by Plaintiffs in their reply brief?
- Do Plaintiffs intend to seek certification as a 23(b)(2) class in the alternative to a 23(b)(3) class? If so, would injunctive relief truly be moot, according to both parties?

The Court would also discuss with the parties how to address the next issue that must be considered in this case: the materiality issue. The parties should discuss at the hearing whether this matter is fit for adjudication via a summary judgment motion or whether a specialized hearing is required.

---

[20] The Court would note without deciding, however, that Plaintiff's arguments as to the Declaration's relevance will likely not be not well-taken, as Dr. Kivetz offered testimony on issues that, while (as noted previously by this Court in the September Order) are perhaps only marginally relevant to class certification, are highly relevant to the dispute as a whole, particularly with regards to the finding of materiality crucial to maintaining class status for Plaintiffs' CLRA claims.