1            UNITED STATES DISTRICT COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                 WESTERN DIVISION

4      THE HONORABLE GEORGE H. WU, JUDGE PRESIDING

5

6    EVANGELINE RED, et al.,            )
                                        )
7                    Plaintiffs,        )
                                        )
8                                       )
            vs.                         )   No. CV 10-1028-GW-AGR
9                                       )
     KRAFT FOODS, INC., et al.,         )
10                                      )
                     Defendants.        )
11    _____ )

12

13

14         REPORTER'S TRANSCRIPT OF PROCEEDINGS

15

16            Los Angeles, California

17      Thursday, April 12, 2012, 10:08 A.M.

18    Plaintiffs' Renewed Motion for Class Certification and

19   Plaintiffs' Motion to Strike or Exclude the Declaration of

20             Professor Ran Kivetz

21
                              PAT CUNEO CSR 1600, CRR-CM
22                            Official Reporter
                              Roybal Federal Building
23                            Room 181-E
                              255 East Temple Street
24                            Los Angeles, California 90012
                              213-290-1817
25                            patcuneo1600@gmail.com
                              www.patcuneo.com

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFFS:    THE WESTON FIRM
                             BY:  GREGORY S. WESTON, ATTORNEY AT LAW
 3                           1405 Morena Boulevard
                             Suite 201
 4                           San Diego, California  92110
                             619-798-2006
 5                           greg@westonfirm.com
                                     -and-
 6                           THE WESTON FIRM
                             BY:  JACK FITZGERALD, ATTORNEY AT LAW
 7                           2811 Sykes Court
                             Santa Clara, California  95051
 8                           408-459-0305
                             jack@westonfirm.com
 9                                   -and-
                             LAW OFFICES OF RONALD A. MARRON, APLC
10                           BY:  RONALD A. MARRON, ATTORNEY AT LAW
                             3636 Fourth Avenue
11                           Suite 202
                             San Diego, California  92103
12                           619-696-9006
                             ron.marron@gmail.com
13                                   -and-
                             MILSTEIN ADELMAN LLP
14                           BY:  SARA D. AVILA, ATTORNEY AT LAW
                             AND  GILLIAN L. WADE, ATTORNEY AT LAW
15                           2800 Donald Douglas Loop North
                             Santa Monica, California  90405
16                           310-396-9600
                             savila@milsteinadelman.com
17                           gwade@milseinadelman.com

18    FOR THE DEFENDANT:     JENNER & BLOCK
                             BY:  DEAN N. PANOS, PARTNER
19                           AND  KENNETH K. LEE, ATTORNEY AT LAW
                             One IBM Plaza
20                           Chicago, Illinois 06011-7603
                             (313) 923-2717
21                           dpanos@jenner.com; klee@jenner.com

22

23

24

25
```

1    LOS ANGELES, CALIFORNIA; THURSDAY, APRIL 12, 2012; 10:08 A.M

2                              -oOo-

3             THE COURT:  All right.  I presume I've called

4    every other case except for Red; is that right?  Red is the

5    only one left, right?

6             Okay.  Let me call Red vs. Kraft Foods.

7             MR. PANOS:  Good morning, Your Honor.  Dean Panos

8    and Kenneth Lee on behalf of the defendant Kraft Foods.

9             THE COURT:  All right.

10            MR. FITZGERALD:  Good morning, Your Honor.

11   Jack Fitzgerald and Gregory Weston from The Weston Firm for

12   the plaintiff.

13            THE COURT:  All right.

14            MR. MARRON:  Ronald Marron on behalf of my firm.

15            MS. WADE:  Gillian Wade and Sara Avila on behalf

16   of Milstein Adelman.

17            THE COURT:  All right.

18            MR. FITZGERALD:  And, Your Honor, we also have

19   Courtland Creekmore and Melanie Persinger from the Weston

20   Firm here with us today.  We have the whole crew today.

21            THE COURT:  Oh, wow.

22            MR. FITZGERALD:  Not the whole crew, but we've

23   got a portion of the crew.

24            THE COURT:  I am honored and thrilled.

25            Does that mean nobody is answering the phones at

1   your office?

2              MR. FITZGERALD:  It's not the whole crew.

3              THE COURT:  All right.  We're here on a second

4   motion to -- a renewed motion for class certification.  I

5   have issued a tentative.  Let me ask.  Does anyone want to

6   talk about it?

7              MR. FITZGERALD:  Yes, Your Honor.

8              THE COURT:  All right.

9              MR. FITZGERALD:  I think it makes sense for us to

10  go first.

11             THE COURT:  If you want.

12             MR. FITZGERALD:  I'll do it from here, Your Honor,

13  if that's okay.

14             THE COURT:  That's fine.

15             MR. FITZGERALD:  So let me begin by saying that we

16  want to thank the court.  This is -- well, you know, we're

17  optimists, you know, and we think this is a really good

18  tentative order on almost all points.

19             We're pleased that we were able to show the court

20  that most of the criteria for certification are met and

21  we're happy to address the remaining issues that the court

22  has in mind.

23             THE COURT:  That was a waste of 30 seconds there.

24  No offense but, I mean, what's the point of that?

25  *(Laughing.)*

| | |
|---|---|
| 1 | MR. FITZGERALD:  Well, Your Honor, I just want to, |
| 2 | you know, we -- the point is just that -- |
| 3 | THE COURT:  You just want to be respectful so you |
| 4 | can really launch into what you think is really wrong with |
| 5 | what I said.  That's fine.  It doesn't bother me. |
| 6 | MR. FITZGERALD:  We do want to be respectful but I |
| 7 | also want to emphasize that we're really close in this case |
| 8 | and I think the court is agreeing we're really close. |
| 9 | And I just want to make sure that, you know, we're |
| 10 | not -- emphasize that we're not ready to give up, so to |
| 11 | speak, based on these sort of few remaining issues; and |
| 12 | we'll talk about why. |
| 13 | So the two things that the court is concerned with |
| 14 | here is it looks like is ascertainability and damages, and |
| 15 | they're somewhat related. |
| 16 | On ascertainability, I think what we need to start |
| 17 | with is what the purposes of the ascertainability |
| 18 | requirement is which is two-fold. |
| 19 | It's, number one, to determine -- |
| 20 | THE COURT:  Well, let me stop you.  It seems to |
| 21 | the court that ascertainability, to my mind, the problem |
| 22 | comes in because if this case is going to go forward as to |
| 23 | damages, you know, 23(b)(3), is it? |
| 24 | MR. FITZGERALD:  Right. |
| 25 | THE COURT:  And the problem is I can't imagine it |

1    going forward in that particular fashion because, again,

2    that's where the ascertainability, that's where all these

3    other problems come up.

4            And it just would seem to me that it could not be

5    managed in a way, you know, would prove beneficial to anyone

6    including the plaintiffs, plaintiffs' class, defendant, or

7    the court.

8            So I have major problems with this case going

9    forward as some sort of damages action; but I can understand

10   perhaps that the case could go forward as a case for some

11   sort of injunctive relief assuming that it's not mooted at

12   this point in time.

13           Although, you know, I don't necessarily buy it

14   merely because of the fact that the defendants no longer use

15   the terminology that they've utilized.  They have utilized

16   clearly in the past and there's nothing to bar them from

17   utilizing it in the future.

18           The mere fact that they ceased voluntarily for one

19   reason or another doesn't mean necessarily that that's

20   mooted out in this particular context especially given the

21   number of times that they have utilized this type of

22   approach.

23           And, again, I think it is a major -- I understand

24   the major issue involved is the extent to which advertising

25   which denotes some sort of health benefits can be deemed to

1    be misleading if, in fact, the product is not healthy in the

2    way that the advertisement either states or suggests.

3           Not to say that that, in fact, is done -- what

4    Kraft has done here; but, you know, I understand that that,

5    I guess, is the pitch that's being made by plaintiffs.

6           MR. FITZGERALD:  Yes, Your Honor.

7           Well, we can certainly talk about a (b)(2) class

8    and injunctive relief; but I don't want to just leave the

9    damages --

10           THE COURT:  And I don't expect you to necessarily

11    to; but all I'm indicating is that I have major problems

12    with 23(b)(3) damages class action because, again, I see

13    major, major problems.

14           MR. FITZGERALD:  Yes, Your Honor.

15           Well, I hope we can alleviate some of the court's

16    concerns today; and, if not necessarily today, you know,

17    maybe we should have, you know, a ten or fifteen pages of

18    briefing on the ascertainability and damages issue.

19           But let me just go into my argument for today and

20    we'll see where we come out.

21           So the purposes of the ascertainability

22    requirement is two-fold.  One is to determine against whom

23    any judgment in the case would be *res judicata*; and the

24    second is to alert class members under the due process

25    clause, members -- people who are members of the class in

1    order to enable them to opt out.

2           I think what the court's concern with here isn't

3    really strictly those sort of purposes of ascertainability

4    but more on the practical side; and two courts recently have

5    distinguished between ascertainability as a legal issue and

6    *res judicata* and due process.

7           And really what they say is a distinct concept of

8    proof of membership; and I think what the court really has a

9    problem with here is the potential difficulties in proof of

10    membership.

11           The court addressed one of the cases in its

12    decision, the *Galvan v. Croslin* case and I'll address that

13    in a minute.  But one of the cases we cited a few times in

14    our brief was Judge Illston's recent decision in January in

15    the TFT antitrust -- TFT-LCD antitrust case up in the

16    Northern District.

17           There the defendants had moved for decertification

18    based on ascertainability after going through more discovery

19    and it was revealed that there were sort of practical

20    problems in people identifying whether an LCD panel in the

21    products they purchased was made by one of the defendants in

22    that case versus somebody else.

23           So what the court said in that case and, you know,

24    we've implored that this court take a careful look at that

25    case.  But the difficulties in identifying the LCD panel had

1    to do with the fact that manufacturers of LCD products

2    frequently buy the panels for their products from multiple

3    sources and that they don't keep detailed records of who

4    they're purchasing from so, therefore, there was no

5    comprehensive list of model numbers that the class could

6    rely on to determine if there was a panel that was made by a

7    defendant.

8            Notwithstanding these difficulties, the court said

9    that there -- the court found that there were numerous

10   factors that made it willing to exercise its discretion in

11   favor of certification.

12           One of these was that defendants, during that time

13   period, had an overwhelming market share of the panels in

14   all products.

15           THE COURT:  Let me just ask.  That situation is

16   not even remotely similar to this one so I don't --

17           MR. FITZGERALD:  I think it is.

18           THE COURT:  Let's get to the point.  I mean --

19           MR. FITZGERALD:  I think it is in this way, Your

20   Honor.  Here the issue -- I think there are two issues about

21   why this might not be ascertainable.  One is what we refer

22   to is outliers, sort of these products that were sold at the

23   same time but which didn't have the representations.

24           But after doing that analysis, you know, we were

25   able to calculate that the most those outliers could have

1    accounted for was about 6 percent of the products sold

2    during the time period.  So really, the vast majority, 94

3    percent or more of the products, sold from 2006 to 2010 bore

4    the representations.

5            So to the extent that there's an issue of proof

6    and there would be over-inclusiveness, the analogy to the

7    market share is that --

8            THE COURT:  Well, let me just ask you.  In other

9    words, but the claimants here who are going to be

10   purchasing, in other words, are they persons who only bought

11   during that period of time?  Or are they also persons who

12   bought before that time and after that time?

13           Because if they bought only because of that during

14   that point in time, I can sort of understand what you're

15   saying.  But if, in fact, they bought before, continued to

16   buy during, and bought after, I don't understand what their

17   claim would be.

18           MR. FITZGERALD:  Well, Your Honor, I think that

19   comes down to the substantive elements of the UCL, FAL, and

20   CLRA; and I think the tentative very carefully identified

21   that.

22           It's not that those people will have to have

23   individual reliance during the time period.  I mean, it's

24   okay if class members purchase before and after because the

25   question is whether they were exposed to a representation

1    that's likely to deceive a reasonable consumer.  That's an

2    objective question.

3            And the California Supreme Court has said that the

4    injury is being exposed to --

5            THE COURT:  Let me just ask you.  If you have

6    proof that a person bought before, during, and after, what

7    is going to be the evidence of that -- that the purported

8    fraudulent statement had some sort of an effect?

9            MR. FITZGERALD:  The evidence is all objective

10   evidence based on the reasonable consumer standard so we're

11   going to submit evidence of materiality from Kraft's

12   documents.

13           In fact, the court found in its tentative order

14   that we made at least a threshold showing of materiality;

15   but whether the representations were material is not

16   evaluated by individual consumers.

17           It doesn't matter whether actually, in fact, it

18   was material to absent class members.  All that matters is

19   if it reach the --

20           THE COURT:  For purposes of damages?

21           MR. FITZGERALD:  Yeah, for purposes -- right, for

22   purposes of damages.  Because as *Sterns* said in footnote 13

23   in the *Sterns* decision --

24           THE COURT:  In other words, the defendant can be

25   punished for engaging in conduct that had no effect on the

1    particular class member and the class member can get damages

2    for that?

3            MR. FITZGERALD:  Right.  Because -- because

4    California has -- what *Sterns* said is California has enacted

5    what amounts to a presumption that if a defendant puts out

6    tainted bait and somebody bites, they've been damaged.

7            And then --

8            THE COURT:  But if the exact -- but if the product

9    is exactly the same before, during, and after, it's not

10   tainted bait.

11           MR. FITZGERALD:  In terms of the pricing that --

12   so I think we are identifying then is really a question of

13   fact about whether there was --

14           THE COURT:  Well, you know, this -- my problem is

15   that these are the types of problems that if this matter

16   proceeds as a, you know, damages action, I just can't

17   imagine how one would resolve this type of scenario given

18   the variations because we have, again, multiple products but

19   I do agree that, you know, taking the products into

20   subclasses helps a lot.

21           But conversely, however, the representations

22   during these periods of time are not the same; and then we

23   have obviously evidence of persons buying before, during,

24   and after.

25           And so we're not limiting it just to only people

1    who only bought during this period of time; and then there's

2    the question of valuation in terms of any purported injury

3    or damages.  I mean, how would that even be calculated?

4         MR. FITZGERALD:  Well, Your Honor, we are limiting

5    it to people who are buying just during this time because

6    the classes are defined by dates; and as we noted, there are

7    no end dates because Kraft has provided them as part of its

8    briefing.

9         So on any given class, there's a begin date and an

10   end date.  Somebody who's a member of that class may have

11   also purchased it before the begin date or after the end

12   date but that's not relevant to whether they can recover for

13   unlawful conduct that was made during the class period under

14   a subclass.

15        And then --

16        THE COURT:  Let me just ask.  Let's assume people

17   bought before the purported misrepresentations and bought

18   during the period of the misrepresentations -- alleged

19   misrepresentations but bought less?

20        Does that mean that they are still damaged?

21        MR. FITZGERALD:  Yes, Your Honor.  Any person --

22        THE COURT:  Well, wouldn't it show that the

23   misrepresentation had adverse affect and so, therefore, they

24   could have decided that they didn't want to eat healthy

25   anymore, they want to eat more junk food, and that by

1   putting this alleged thing of saying it was healthy had an

2   adverse affect on them.

3           MR. FITZGERALD:  I understand the logic of Your

4   Honor's argument or at least hypothetical argument or

5   devil's advocacy.  But this -- remember, under California

6   law, these standards are all based on the objective

7   reasonable consumer.  We're not going to be looking at what

8   individual absent class members did.

9           THE COURT:  Is that for purposes of liability or

10  is that for purposes of damages?

11          MR. FITZGERALD:  That's for purposes of both, I

12  believe, because if you have liability, what *Sterns* and

13  *Tobacco II* say is -- *Sterns* said if you put out tainted bait

14  so, in other words, if there's liability, then anybody who

15  bit on it was damaged.

16          Even if, in fact, they --

17          THE COURT:  But damages is, you know, the tainted

18  bait is kind of pejorative because the tainted bait you're

19  saying it's tainted bait.  But the plaintiffs here aren't

20  alleging an actual health impact on class members.

21          What they're saying is a financial aspect of it is

22  the damages is my understanding and so, therefore, we're

23  talking about something that's totally different it seems to

24  me.

25          MR. FITZGERALD:  Oh, well, Your Honor, the

1    allegation is that there was a statement made on the package

2    or a message conveyed by the packaging as a whole that

3    the packaging was --

4            THE COURT:  Not the packaging but that the product

5    itself.

6            MR. FITZGERALD:  The product -- a misleading

7    message that the product itself is healthier than it

8    actually is.

9            THE COURT:  Yes.

10           MR. FITZGERALD:  In terms of --

11           THE COURT:  But the injury is a financial injury.

12   The injury is not a health injury which makes it different

13   from other types of cases.

14           MR. FITZGERALD:  That's true.  But it wasn't a

15   health injury in *Sterns* either; and in any event, I think --

16   and also in *Tobacco II* was -- *Tobacco II* was false

17   advertising case.  It wasn't a smoking case but it was false

18   advertising.

19           So there was a health element to it and there's a

20   health element to it here; but it comes down to if anybody

21   buys a product that has a representation on it that has been

22   determined to be deceptive, they've been harmed.

23           Whether or not they've sort of actually been

24   harmed, if you went and talked to them, that's really not

25   relevant under California law.

```
1              California law presumes that anybody who's bought

2     a product with a deception has been harmed because

3     California law gives consumers the right to be free from

4     deceptive products and deceptive statements.

5              So there is an injury there.  Remember, only the

6     named plaintiff has to show lost money or property.

7              Now, I also want to --

8              THE COURT:  In this type of context of small type

9     of purchasing, in other words, I could understand, you know,

10    if somebody buys something that's fairly substantial, you

11    know.  You know, one can presume that, you know, it has some

12    affect or something of that sort.

13             But we're here, again, I don't know of any cases

14    but maybe that one case, which is an outlier, where the

15    product was, you know, something that is, you know, a small

16    consumable item.  And, again, these are the problems that

17    the court finds in a damages type of action.

18             MR. FITZGERALD:  And, Your Honor, let me also draw

19    the distinction between damages under the CRLA and

20    restitution.

21             Damages, actual damages have to be calculated and

22    we've suggested a means for calculation.  I think that means

23    would work.  It's been accepted in other cases.

24             THE COURT:  Which one are you talking about?  You

25    gave two.
```

| | |
|---|---|
| 1 | MR. FITZGERALD:  Well, number one, I think that |
| 2 | full refunds is appropriate.  Two cases, two recent cases I |
| 3 | found this, one is steroid hormone and another was the |
| 4 | Kroger case that we cited in our Kivetz' motion. |
| 5 | And the reason for that is because the plaintiffs |
| 6 | there allege that they wouldn't have bought the products at |
| 7 | all had they not been misled by the -- |
| 8 | THE COURT:  Obviously, that's not what we have |
| 9 | here. |
| 10 | MR. FITZGERALD:  -- misrepresentation.  I don't |
| 11 | know if that -- |
| 12 | THE COURT:  You're not going to have -- I don't |
| 13 | think you're going to have -- are you going to have somebody |
| 14 | who says they would not have bought the product at all but |
| 15 | for the representation? |
| 16 | I mean, if you have that and if that is pretty |
| 17 | much going to be true of every class member, I do agree that |
| 18 | that is very significant and the defendant would have a |
| 19 | harder time making arguments of one sort or another. |
| 20 | But it's my understanding that the plaintiffs are |
| 21 | not going to go anywhere close to that.  In other words -- |
| 22 | MR. FITZGERALD:  Well, Your Honor, it's an |
| 23 | allegation in the Complaint and there is actually a third |
| 24 | plaintiff Ford-Soon who bought the Teddy Grahams at issue |
| 25 | and I'm not familiar with what his circumstances are |

1   particularly but -- and in any event not up for being a

2   class representative at this point, so I don't know that

3   it's relevant.

4          But in any event, it's an allegation in the

5   Complaint and, you know, I think it's an issue of fact.  But

6   even if the court doesn't want to accept full refunds, the

7   alternative we've proposed is finding basically a price

8   premium using comparators and courts do this all the time.

9   We can either compare these products to the same Kraft

10  products that were sold.

11         THE COURT:  But let me just ask.  If the price of

12  the conduct -- and I'm not saying this is true but I assume

13  hypothetically -- if the price of the product did not change

14  once the misleading language was put on there, then when you

15  say a "price premium," what price premium are you talking

16  about?

17         MR. FITZGERALD:  Your Honor, if discovery reveals

18  that the price did not change, then there may be a damages

19  issue that we have; but we have not been given discovery on

20  pricing.  We asked for it and we were refused it; and at the

21  end of the day, it's an issue of fact for determination at a

22  damages phrase at trial or maybe on summary judgment.

23         So it is possible that there are no damages if

24  there was no price premium.  In terms of actual damages

25  under the CRLA.  But that's not enough to deny

1    certification.

2         But I do want to draw the distinction between

3    damage under CRLA and restitution.  It's clear that

4    restitution is something different and that the court has

5    wide discretion to order restitution so long as there's a

6    factual basis for it, but that's not the same as a

7    calculation.

8              THE COURT:  Is restitution even possible here?

9              MR. FITZGERALD:  It is possible, Your Honor.

10             THE COURT:  To return that which they consumed?

11             MR. FITZGERALD:  Well, wouldn't it be the

12   plaintiffs returning what they -- restitution doesn't

13   require an equal exchange.  Restitution would be made for --

14             THE COURT:  It depends on the nature of the

15   restitution.  For example, sometimes restitution means that

16   you put the parties back to where they were in square one.

17        In other words, that which supposedly is defective

18   that plaintiff purchased, the plaintiff returns.  In

19   exchange, the defendant returns the full amount of the money

20   that they received from the particular exchange in question.

21             MR. FITZGERALD:  I think the way that we would

22   argue this on summary judgment or at trial is that these

23   products were labeled as being something, as being -- or

24   there was a message that they were healthy products and, in

25   fact, they were unhealthy products.

1    So we're going to present evidence about just how

2    unhealthy they were, about what sort of an increase in risk

3    of heart disease, increase in risk of Alzheimer's and cancer

4    these products -- consumption these products presented.

5    And then the fact-finder will be able, using that

6    sort of evidence, to determine what the products were

7    actually worth if they were not labeled as healthy but just

8    were presented what they actually are.

9    So, again, there's ample authority in *Colgan* and

10   *Fletcher v. Pacific* that the court has wide discretion to

11   award restitution as long as it has some factual basis.

12   And I'd just like to quote the *Wiener v. Dannon*

13   case on this.  The court there said:  If the class succeeds

14   on the CRLA claims, then actual damages for these claims can

15   be calculated by subtracting the value of the products

16   without the claimed health-claim benefits, uniform value to

17   be determined based on the evidence at trial from the price

18   the particular class members is able to prove he or she

19   paid.

20   Furthermore, with respect to the restitution

21   permitted under CRLA and the UCL, the court has very broad

22   discretion to determine an appropriate remedy award as long

23   as it is supported by evidence and is consistent with the

24   purpose of restoring to the plaintiff the amount the

25   defendant wrongfully acquired.

1           Not only that, but *Colgan* and *Fletcher* say
2    restitution can also be used to punish a defendant and to
3    prevent them --
4           THE COURT:  What was that case again?
5           MR. FITZGERALD:  *Colgan v. Leatherman Tool Group*.
6           THE COURT:  When was it decided?
7           MR. FITZGERALD:  Oh, when was it decided?
8                *(Pause in the proceedings.)*
9           MR. FITZGERALD:  2006.
10          THE COURT:  Okay.
11          MR. FITZGERALD:  And *Fletcher* was decided in 1979
12   but has been cited hundreds of times since and is
13   consistently still cited.
14          The last point I want to emphasize on damages is
15   that even if the court has reservations about it at this
16   point, the Ninth Circuit almost two years ago, just
17   February 2010 in *Yokoyama v. Midline*, said definitively
18   that:  Individual issues of damages cannot defeat
19   certification in this circuit.
20          In the recent decision of *Johns v. Bayer*, which
21   was certified out of the Southern District within the last
22   month or so, reemphasized this point, said that there may be
23   individual issues of damages but in this circuit it's
24   insufficient as a matter of law to defeat certification.
25          So I think --

```
1          THE COURT:  But was the issue whether or not it

2   would be certified as a 23(b)(3) versus 23(b)(2) or is it a

3   situation where the court refused to certify the class,

4   period?

5          MR. FITZGERALD:  Actually, in both cases -- well,

6   in the Ninth Circuit case, Yokoyama, the Hawaii court

7   refused to certify the case under 23(b) finding that

8   individual issues of damages calculations predominated over

9   common issues.

10         And the Ninth Circuit reversed that and said:  No,

11  the common issues here are whether defendant's

12  representations were misleading.  Individual issues -- they

13  said individual -- damages is invariably an individual

14  issue.

15         In fact, the Ninth Circuit said this in Blackie v.

16  Barrack back in the '70s.  But they said:  Damages is

17  invariably an individual issue, but it's not of sufficient

18  import to predominate over the issue of whether defendant's

19  representations were misleading; and that's as a matter of

20  law in this circuit.

21         THE COURT:  Well, what can I say?  The Ninth

22  Circuit has said a lot of things and sometimes later on it

23  gets reversed, sometimes not.

24         But in either case, the Ninth Circuit doesn't do

25  the trials of these matters and, again, I cannot imagine
```

23

```
1   some sort of damages class action in this regard.  It would
2   be virtually impossible to do.
3               MR. FITZGERALD:  Your Honor, I don't think that's
4   right.  I think what we're going to do is we'll have a
5   damages expert.  We're going -- we'll have records from
6   Kraft of how many units and at what price it sold the
7   products.  We're going to try to develop to show that there
8   was a premium so, in other words, once they started using --
9               (Counsel overtalking; not reported.)
10              THE COURT:  -- the issue of what the premium was.
11              MR. FITZGERALD:  Because, well, what we'll do is
12  once they started selling -- I think we gave the example,
13  Your Honor.
14              THE COURT:  It's not a situation where this
15  product was not sold before.  This product was sold.
16              MR. FITZGERALD:  Right and --
17              THE COURT:  And did they raise the price when they
18  stuck this new advertisement on?
19              MR. FITZGERALD:  Your Honor, we don't know at this
20  point because we've been --
21              THE COURT:  Well, let's assume for purposes of
22  argument they did not.  Let's assume that this is one of
23  those situations that they didn't raise the price of the
24  product when they started this new advertisement,
25  advertising line, or gimmick.
```

1      MR. FITZGERALD:  Right.

2      THE COURT:  What are the damages at that point?

3      MR. FITZGERALD:  Your Honor, if that turns out to

4  be the case, it may be that there are no damages and that we

5  win on liability and not damages.  But that is not a reason

6  to deny certification; and, you know, I'll go even a step

7  further and I'll tell you about a case where that happened.

8      THE COURT:  Well, let me just ask you.  If you win

9  on liability but you have no damages, do you win?

10      MR. FITZGERALD:  Well, you know, again, we're --

11      THE COURT:  If you're not seeking some form of

12  injunctive relief.

13      MR. FITZGERALD:  Again, we're talking about only

14  damages under the CRLA so we still have restitution under

15  the UCL and FAL and CRLA.  They're not the same thing, Your

16  Honor.  One is an equitable remedy and one is compensation.

17      THE COURT:  Let's assume the same situation in the

18  restitution situation.  Let's assume that the product was

19  sold for a dollar a package and then after this advertising

20  campaign started, it sold for a dollar a package.  What's

21  the restitution?

22      MR. FITZGERALD:  I think in that case in the

23  restitution you don't have to -- it's not a comparator

24  issue.  You're not -- it's not a question of whether there's

25  a premium.

1          THE COURT:  Well, what should the restitution

2     amount be?

3          MR. FITZGERALD:  The restitution would be whatever

4     the court or the jury determines that the actual value of

5     the product was if it's something less than a dollar.

6          THE COURT:  Well, if the product is exactly the

7     same, the price has not changed, and there is this

8     advertisement which does not have to be the basis upon which

9     the class member purchased the product as long as it was a

10     factor in the purchase, I guess.  I guess maybe that's how

11     California phrases the law now or whatever.

12          MR. FITZGERALD:  Actually --

13          THE COURT:  Let's assume that's the case.  What is

14     the restitution amount in that context?

15          MR. FITZGERALD:  Your Honor, I think it's whatever

16     the fact-finder decides it is.  That's what *Colgan* says.

17          THE COURT:  The fact-finder has to be informed as

18     to what the law is as to --

19          MR. FITZGERALD:  Right.  But what *Colgan* says --

20     what the California law says is that there has to be a basis

21     in fact but that the court's discretion is therefore very

22     broad to hold up the purposes of the UCL.

23          So I think it comes down to what does the court

24     need to award in restitution in order to uphold the purpose

25     of the UCL, to prevent defendants from making misleading,

 1   deceptive advertisements to the public.

 2            If the court -- remember, this is if the court

 3   determines that there was deceptive advertisement.  So if

 4   the court determines there was deceptive advertisement,

 5   we're going to present evidence that the ingredients in this

 6   products significantly raised the risk of all sorts of

 7   disease and premature death.

 8            And therefore advertising them as healthy -- if

 9   you advertise it as healthy and sell it at a dollar, maybe

10   it's really worth 50 cents because it gives you a 50 percent

11   increase in risk of heart disease.

12            THE COURT:  Why would that ever be if it was sold

13   prior to that point in time for a dollar?

14            MR. FITZGERALD:  I think that's irrelevant to the

15   issue of restitution.  It may be relevant to damages because

16   you need sort of a comparator but restitution only has to be

17   based in -- have some sort of factual basis.

18            THE COURT:  No, but I do understand that.  But

19   even talking in terms of restitution, if the product was

20   sold for a dollar beforehand, sold for a dollar afterwards,

21   what is the restitution amount?  Because, obviously, the

22   health claim didn't affect price of it.

23            MR. FITZGERALD:  Well, Your Honor, again, I

24   think --

25            THE COURT:  It didn't affect the purchasers

1  willingness to pay the price for it since the price before

2  and after is also the same.

3          MR. FITZGERALD:  Well, Your Honor, you can't -- I

4  don't think you can delve into how it affected absent class

5  members.  That's not the issue under California law.  The

6  issue is whether Kraft made a material misrepresentation

7  that was likely to deceive the public under the

8  reasonable -- objective reasonable consumer standard.

9          THE COURT:  All right.

10          MR. FITZGERALD:  What I would say is this same

11  issue has to be true in every case.  It's got to be true in

12  *Blue Sky* where, you know, the same beverages may have been

13  sold before and after with the thing on it.

14          It's got to be true in the walnut case where the

15  walnuts could have been sold at the same price before and

16  after with the Omega 3 claims on it.

17          This isn't an issue that's unique to this case,

18  and it's not an issue that's sufficient to defeat

19  certification.  All it is is an issue of fact and maybe an

20  issue of law for the merits stage of the case, maybe at

21  summary judgment or trial, but it's not an issue sufficient

22  to defeat certification.

23          Thank you, Your Honor.

24          THE COURT:  All right.  Let me have defense

25  respond to all this.

 1          MR. PANOS:  Thank you, Your Honor.

 2          I have a couple of points.  I think Mr. Fitzgerald

 3   made any misstatements of the law and facts but let me just

 4   highlight a couple.

 5          Number one, Judge, he keeps saying:  Well,

 6   California law says this and California law says that.  UCL

 7   and FAL and CRLA, none of those laws changed Rule 23 at all.

 8          And Rule 23 is designed to determine all the

 9   issues that Your Honor is addressing, all the questions

10   you're asking about manageability, feasibility.

11          THE COURT:  Well, but he's saying insofar as the

12   court's arguments are concerned is that maybe the case --

13   the claims could be certified both -- I presume this is what

14   he's going to argue eventually -- claiming that the -- it

15   should be certified under both sections.

16          Why does it have to be limited to one versus the

17   other and then, you know, maybe later on in the case, then a

18   determination would have to be made prior to, obviously, its

19   being tried as to whether or not it's going to go as a 23,

20   you know, (b)(3) or (b)(2).

21          MR. PANOS:  Because the law says you've got to

22   address all of these issues you're talking about under the

23   context of Rule 23, not under the context of the UCL, CRLA.

24          THE COURT:  No.  But it's still -- there's nothing

25   in Rule 23 that bars certification under both sections if

1    it's close.

2         MR. PANOS:  Well, no, of course not.  But the

3    questions you're raising as to the problems raised by what

4    they're trying to certify is a Rule 23 question.  It has

5    nothing to do with the UCL or the FAL or CRLA --

6         THE COURT:  Yeah, but --

7              *(Counsel overtalking; not reported.)*

8         MR. PANOS:  And there's case after case that says

9    that.  So, I mean, it's really -- no one is disputing what

10   California law says.  California law is not dramatically

11   different than any other states.

12        THE COURT:  Oh, trust me, it is.

13        MR. PANOS:  No, some California decisions are

14   outside the norm of what Rule 23 is; but certainly not

15   California statutory law is not different than almost any

16   other states.

17        THE COURT:  Well, wait a second.  You're talking

18   about the 23 aspect, Rule 23 aspects.

19        MR. PANOS:  Because everything -- because it has

20   to be decided under Rule 23.  Your Honor is not going to

21   make a determination under UCL or FAL or CRLA.  You're

22   obviously going to make a determination under Rule 23.

23        THE COURT:  No.  But, obviously, the claims that

24   are involved involve the substantive law.  I do understand

25   that, you know, the substantive law itself doesn't

1    necessarily change the factors in Rule 23.

2           But, obviously, the way that you apply Rule 23

3    depends upon the context in which they're raised; and so,

4    therefore, you have to look at the underlying substantive

5    law or sometimes referred to as, quote, merits to make the

6    determination as to how in that particular context Rule 23

7    is applied.

8           MR. PANOS:  Well, certainly, Your Honor, but

9    there's nothing extraordinary about California law in this

10   regard.  Let me go on because it's not worth --

11          THE COURT:  I agree.

12          MR. PANOS:  You know, every time somebody cite --

13   the plaintiff cite one of these yogurt cases, I say:  Yeah.

14   Please keep citing them to Judge Wu.  Please do.

15          THE COURT:  Why?  Because I like yogurt?

16          MR. PANOS:  Because it shows -- because it just

17   highlights the fundamental difference in the cases and what

18   those cases were about.

19          And when Your Honor was talking about them in the

20   terms of calculation of damages, the *Wiener* case, the *Dannon*

21   case, the pro-biotic cases, in those cases, as the court

22   found in class certification hearings, the defendant had an

23   original brand of yogurt that they have been selling for

24   years and years and years; and then during the class period

25   they created this premium brand where they charged more

```
 1   money based on a claim that it had these pro-biotic effects,
 2   these digestive health effects.
 3          Okay.  The only people the court reasonably found
 4   and which plaintiffs supported with evidence, the only
 5   reason anybody would have bought the new and more expensive
 6   product was because of the claim.  Because that was the only
 7   difference in the product was this pro-biotic claim.
 8          So if that's what they want to rely on, please do,
 9   because there's no -- any way you could argue that there's
10   any similarity between those cases.  They charged a premium
11   based on the claim.
12          THE COURT:  But is the fact that they want to go
13   that route and they're wrong bar them from attempting to go
14   that route and later be proven wrong?
15          In other words, they can say:  We insist that you
16   certify this as a 23(b)(3) and I say:  Okay.  You twisted my
17   arm.  I'll do it just so that I can you shut up and not
18   listen to anymore of your argument.  But in the end I know
19   that they're going to lose on that argument.
20          MR. PANOS:  The answer is yes, Judge, because what
21   the court was able to find in certifying the class is that
22   you do have a cohesive group of purchasers where it could be
23   found, based on the evidence plaintiffs submitted, not the
24   arguments that plaintiffs submitted -- because that's all we
25   ever hear here are arguments and pleadings and reporting
```

1    back, you know, reciting back to allegations -- is that the

2    only purchasers of those products were the people who were

3    purchasing for the pro-biotic effect.  That is a 23 issue.

4         And so you have a cohesive group.  You can say:

5    Well, why would somebody pay $1.50 more for the little thing

6    of this, who has been a regular Dannon yogurt or Yoplait or

7    whatever the difference -- and there were two cases against

8    both manufacturers, General Mills and Dannon -- clearly the

9    claim had something to do with the purchase decision.  There

10   wasn't this history before, during, and after.

11        And, in fact, Your Honor, you raised the problem

12   of the before, during, and after purchases; and let me

13   submit to you, Judge, the reason why that's a major problem

14   is because there is no case that plaintiff cites in support

15   of class certification nor could they find where that issue

16   is addressed.

17        In fact, where that issue is addressed is in the

18   cases where you have longstanding popular brands.  These

19   iconic brands:  The *Listerine* case, the *Coca Cola* case, the

20   *Orville Redenbacher* case, Your Honor.

21        And the courts highlighted those problems saying:

22   How am I possibly going to certify a class?  This wasn't a

23   merits issue.

24        How am I possibly going to -- all those cases were

25   decided on the merits -- or excuse me -- were decided at

1   class certification.

2          How can we possibly certify a class of people

3   where I've got these longstanding brands where advertising

4   changed, marketing ploys, pitches, differences, emphasis,

5   whatever it is, to people who have been buying these

6   products for decades under a variety of different things?

7          How could we ever have a cohesive group of people

8   who I can honestly as a court say:  Yep.  That's like the

9   pro-biotic case.  There's a group of people who clearly

10  bought based on some representation that, you know, may or

11  may not ultimately be determined to be deceptive.

12         So the only case that's anywhere close to what we

13  have here, these Nabisco products, are the three cases in

14  which the court uniformly, every single time, denied class

15  certification at the class certification stage.

16         Now, Judge, one of the issues we talked about was

17  ascertainability; and let me just say this because you're

18  going to give them a chance to now plead -- well, they

19  already did this -- try again to do a (b)(2) class under the

20  notion.

21         Let me just say this.  Ascertainability is a

22  Rule 23(a) issue.  If you can't satisfy Rule 23, you can't

23  get a (b)(2) class either.  And Your Honor, I think, made

24  one statement that I think is incorrect in the tentative.

25              THE COURT:  Only one?

```
 1            MR. PANOS:  Well, no, a few, but one that
 2   certainly affects where we go from here.
 3            Your Honor said that a lack of ascertainability
 4   alone would generally not suitable --
 5            THE COURT:  What page are you reading?
 6            MR. PANOS:  It's the Galvan case.  I'm sorry.
 7   It's page -- you cite Galvan.  Give me one sec.
 8                 (Pause in the proceedings.)
 9            MR. PANOS:  I'm sorry, Judge.  It's page 6.  You
10   say:  A lack of ascertainability alone will generally not
11   scuttle class certification citing Galvan.
12            I think that is a misstatement of the law and I'll
13   tell you why it's a misstatement of the law.
14            We cited numerous district court cases where the
15   court of appeals and district courts have denied class
16   certification because of ascertainability.
17            Fine v. ConAgra.  That's the popcorn.  There were
18   too many different reasons why consumers would have bought
19   Orville Redenbacher popcorn.  That's exactly what the court
20   said.
21            I don't have an ascertainable class.  I don't have
22   an ascertainable class.  They could have bought it because
23   it had diacetyl, they could have bought it because it didn't
24   have any diacetyl, they could have bought it because they
25   always bought Orville Redenbacher popcorn.
```

1          The *Hodes v. Van's International* case, the waffles

2     case.  How am I going to determine who's in the class?

3     There's no receipts to determine who's on there.  That's

4     what the court said.

5          *Oshana v. Coca Cola*.  Too many reasons why

6     somebody would buy Diet Coke.  How could I, as a court,

7     determine whether the person bought it based on the type of

8     artificial sweetener is in the product and being advertised?

9          THE COURT:  But that -- see, that's where I -- in

10    other words, the problem that I would have and I do have --

11    and I agree with you -- is in the context of the (b)(3)s.

12          Because that is where those types of

13    determinations really have to come to fore because the whole

14    purpose is the damages; and why even go through this charade

15    if we're going in the end concede that there's no possible

16    way that we're going to be able to do a damages as the end

17    result of that litigation.

18          It's different, however, that insofar as the

19    (b)(2) because the (b)(2) you're only attempting to get

20    injunctive relief and that is to stop the bad conduct and/or

21    to prevent its occurrence if it's likely to occur or can

22    occur in the future.

23          And so, you know, that's the reason I said there's

24    a possibility for a (b)(2) where I would have major problems

25    with the (b)(3).

```
 1              MR. PANOS:  Well, I'll tell you why because I

 2   think actually Mr. Fitzgerald gave you the reason why.

 3              THE COURT:  He didn't do it intentionally.

 4              MR. PANOS:  I actually agree with him on this.

 5              There's a res judicata effect to that.  Who you

 6   put in the class, how you define a class, whatever ruling

 7   comes up as a (b)(2) injunctive relief binds that class.

 8              Okay?  So they couldn't go back and try to alter

 9   whatever decision is made on the injunctive relief?

10              THE COURT:  Why would they want to or --

11              MR. PANOS:  Why?  Why would it --

12              THE COURT:  Why wouldn't -- I mean, what is their

13   injury?  In other words, if a determination is made that,

14   you know -- you know, if it's litigated and it's eventually

15   determined that the alleged false statements were not, in

16   fact, false or not actionably false, I mean, you know, it's

17   been done so --

18              MR. PANOS:  I agree but that you've bound somebody

19   else from hiring The Weston Firm from trying another shot at

20   it.  I mean --

21              THE COURT:  But so what?  I mean, it's already

22   been tried.  It's already been done and, you know, that --

23              MR. PANOS:  Judge, I agree with you.  All I'm

24   saying to you is the reason why ascertainability is relevant

25   to (b)(2) is for that legal reason.  I'm not saying whether
```

```
 1   it makes sense for somebody to be able to have another crack

 2   at it.

 3            THE COURT:  No, but it's ascertainable because --

 4   I mean, the fact that they've defined the class in the way

 5   they've defined -- in other words, limiting it to a product,

 6   limiting it to a period of time, limiting it to a specific

 7   representation or alleged false representation, they've done

 8   that already and, you know, so, okay, it's been litigated.

 9            MR. PANOS:  Judge, I don't disagree with you.

10   Look, I don't disagree why any class member would care less

11   about this case.  Okay?

12            I mean, the own plaintiffs that had so many

13   statements in here that tells you they don't care about the

14   issues that are being raised in this case.  Okay?

15            So I agree with you.  But all I'm saying to you is

16   ascertainability is a 23(a) requirement; and if you can't

17   show ascertainability, you can't get a (b)(2) class.

18            THE COURT:  I don't understand.  As long as you

19   can show -- as long as you can show that --

20            MR. PANOS:  You have to certify the class.

21            THE COURT:  Huh?

22            MR. PANOS:  To give them a (b)(2) class, you have

23   to define the class.

24            THE COURT:  They defined it.  Purchasers of the

25   product during this period of time when there is a material
```

```
 1    misrepresentation on the product.

 2            That, to my mind, is sufficient for a (b)(2).  Why

 3    wouldn't it be?

 4            MR. PANOS:  Because the class isn't ascertainable

 5    for all the reasons Your Honor has been talking about.

 6            THE COURT:  No, there's a difference between

 7    damages and the injury.

 8            MR. PANOS:  Your Honor, I respectfully suggest --

 9            THE COURT:  And I would say this.  Under

10    California law, that's all you need.

11            MR. PANOS:  Judge, I respectfully suggest you read

12    the cases that I've been saying to you:  Fine v. ConAgra,

13    Hodes v. Van's International, Oshana v. Coca Cola, the more

14    recent Williams v. Oberon case where the Ninth Circuit cited

15    approvingly and it upheld the district court's finding about

16    all the problems with ascertaining a class where you are

17    relying on class members to self-select based on, you know,

18    out the ether.

19            THE COURT:  They're not self-selecting.

20            MR. PANOS:  Of course they're self-selecting,

21    Judge, because we know as -- we know from the factual record

22    that they would have to say:  Oh, yeah, I recall back in

23    2006.

24            THE COURT:  Why would they have to do that?

25            MR. PANOS:  Because they have to be a class
```

1  member.  How else are we going to determine who's in the

2  class?

3          THE COURT:  Maybe class -- I don't think class

4  actions have changed so much in the last --

5          MR. PANOS:  Judge, they have to self-identify to

6  become a member of the class.

7          THE COURT:  No, they don't.  You certify the

8  class.  When do you have to -- for terms of injunctive

9  relief?

10          MR. FITZGERALD:  And, Your Honor, this actually

11  highlights why ascertainability is not a problem for a

12  (b)(3) class.  What Mr. Panos is talking about is proof of

13  membership, not ascertainability.

14          The class is ascertainable as a (b)(2) class

15  because we've defined what the class is and anybody would be

16  bound by it.  So that way, if somebody comes in and says:  I

17  want to -- you know, I want to get injunctive relief against

18  Kraft for using these things and says:  I bought one of

19  these products so I have standing.

20          Then the court can say:  But you were a part of

21  this definition.  I could look at these objective factors.

22  You bought one of these products during this time period

23  that had this representation on it, you were part of the

24  class.  You're ascertainable when you come into court.

25          MR. PANOS:  Your Honor --

| | |
|---|---|
| 1 | MR. FITZGERALD:  What he's talking about for |
| 2 | (b)(3) damages is proof of class membership; and he's |
| 3 | talking about:  We can't trust people.  We can't trust |
| 4 | people.  We can't rely on what they say. |
| 5 | That's not what *Williams* said, by the way, or the |
| 6 | underlying *Williams* case. |
| 7 | And, also, Your Honor said that they can't use |
| 8 | that *Williams* case because it's not precedential; and I |
| 9 | would point out, also, that the Ninth Circuit has never, |
| 10 | never issued an opinion on ascertainability because it's |
| 11 | really not a big issue in these cases particularly when all |
| 12 | the other criteria of Rule 23 are met. |
| 13 | MR. PANOS:  Judge, I didn't interrupt |
| 14 | Mr. Fitzgerald during his argument.  I don't know why he did |
| 15 | so for me. |
| 16 | THE COURT:  I know.  You were amazingly patient. |
| 17 | I was quite surprised. |
| 18 | MR. PANOS:  Well, because I know you're -- I |
| 19 | just -- whatever. |
| 20 | MR. FITZGERALD:  I thought I was invited but I'll |
| 21 | sit back down and I'll respond after. |
| 22 | THE COURT:  You weren't asked by anybody other |
| 23 | than yourself. |
| 24 | MR. PANOS:  Look, Judge -- |
| 25 | MR. FITZGERALD:  I apologize. |

```
 1              MR. PANOS:  -- I would suggest, Your Honor, that

 2    if you think that ascertainability somehow is not relevant

 3    to what we're talking about here, I suggest, Your Honor --

 4              THE COURT:  No, I'm not saying that it's not

 5    relevant because, obviously, I've indicated that's a major

 6    problem insofar as (b)(3) is concerned.

 7              The question to my mind is the extent to which it

 8    becomes a problem in the (b)(2) context of this case.

 9              MR. PANOS:  Since Your Honor is giving them an

10    opportunity to sort of do that, I'll address it at such time

11    as Your Honor wants to do that; but I'm pretty confident

12    we're right on that.

13              But, look.  I don't want what there is more to

14    argue about it.  I think Your Honor has indicated that

15    you're going to give them some opportunity to do this and,

16    again, in some way.

17              THE COURT:  Well, but I -- the thing I want to

18    make sure about is a couple of things.  I mean, I've raised

19    a number of issues in this case.  You know --

20              MR. PANOS:  Can I address one thing though, Your

21    Honor, just in that regard?

22              THE COURT:  Sure.

23              MR. PANOS:  Let me just say this and I don't know

24    where we're going from here other than it sounds like the

25    tentative is still tentative.
```

1          We've been at this a long time and we've spent my

2    client a lot of money.

3          THE COURT:  You asked for a lot of continuances,

4    too.

5          MR. PANOS:  Well, I mean -- there -- let me just

6    say --

7          THE COURT:  In other words, I should be denying

8    your request for continuances from now on because you guys

9    certainly asked for a lot of them which I've --

10         MR. PANOS:  Well, you know, two hundred pages of

11   briefing, I guess, sort of gets you that.  But, Judge, this

12   an adversary proceeding where they have a burden of proof

13   and they have to come forward with the proof at the time

14   Your Honor notices up the motion or the motion is noticed

15   up.  Okay?

16         And all I'm saying, Judge, is we gave them one

17   shot at the apple.  You come forward with your evidence.

18   Class denied.  We gave them again shot.  Come forward with

19   your evidence.  Class denied.  And now it almost sounds like

20   here we go again.  Been there.

21         In my mind, Your Honor, and I think in my

22   experience, you know, it's an adversary proceeding.  You

23   come forward with your evidence.  If it's not sufficient to

24   meet your burden of proof, you lose and you go on.

25         And if Your Honor is wrong, we should take this up

1    to -- they can take this up under Rule 23(f) if they think

2    that Your Honor erred by denying class certification here;

3    and all I'm saying is we've kind of got to get to the end of

4    this.

5            THE COURT:  I understand that but, hey, what can I

6    say?  Let me just ask, get some of these questions

7    answered --

8            MR. PANOS:  Sure.

9            THE COURT:  -- and we'll figure out where we're

10   going from there.

11           The court has already indicated and I think

12   somewhat clearly that I have major problems with the

13   23(b)(3).  Or do the plaintiffs wish to persist along those

14   lines?

15           MR. FITZGERALD:  Yes, Your Honor.  I don't think

16   we're willing to concede the 23(b)(3) class --

17           MR. PANOS:  Your Honor --

18                   *(Overtalking; unreportable.)*

19           THE COURT:  The question is how much more

20   litigation -- now you're interrupting him.  You were better

21   before.

22           MR. FITZGERALD:  Your Honor --

23           THE COURT:  Let me just ask.  What are you

24   going -- what else are you going to show me, present to me

25   that would cause me to change my tentative in this regard?

1    MR. FITZGERALD:  Well, I'll give you an example.

2  One of the things in your tentative you said is that unlike

3  this case, the *Galvan* case involves a situation where the

4  defendant had records of the retailers to which have sold

5  the products.

6    Well, that's not unlike this case --

7    THE COURT:  That's not -- but that's -- no, there

8  are no records insofar as class membership is concerned and,

9  therefore, if this case is a damages case, in other words,

10  you're saying that you're going to calculate damages -- I

11  mean, again, I don't understand.  I really cannot conceive

12  of a way in which damages would be calculable in this

13  particular situation.

14    MR. FITZGERALD:  Your Honor, if that's the case,

15  then I think the best thing to do would be to maybe to --

16  you know, we disagree with that.  I want to make that clear.

17    But if we have not convinced the court, I think

18  the thing to do would be maybe to not certify the CRLA

19  damages claim.  But this -- that -- it's not the same

20  analysis for restitution.

21    But the reason I was talking about the *Galvan* case

22  is because the issues in that case on ascertainability were

23  the same.  They said consumers discard their calling cards

24  just like people discard their packaging here.

25    Consumers wouldn't remember the pin on their

1    calling cards so they couldn't know which one.  Consumers

2    wouldn't remember where they bought the calling cards.

3            But what the *Galvan* court said is that the

4    defendant, *Croslin*, had records of which retailers it had

5    sold the cards to so that they could post notice at those

6    retailers and reach the same people who used those

7    retailers.

8            Kraft has records of the retailers.  It knows who

9    it sells its products to; and one of the questions you asked

10   in your tentative is:  What are the practical ways we can

11   use to identify members here?

12           I want to emphasize that.  Almost everybody who

13   purchased one of these Kraft products from 2006 to 2010 or

14   2011, depending on the subclass period, bought one with a

15   misrepresentation.

16           MR. PANOS:  Fundamentally a false statement,

17   Judge.

18           THE COURT:  Again, you were so good before.

19           MR. PANOS:  It's --

20           THE COURT:  Let me just stop you.  You know, you

21   recognized that you were good before so be good and let him

22   finish.

23           MR. FITZGERALD:  Your Honor, we've done the

24   analysis.  We can show you and I can go through the analysis

25   if you like.  I have a chart on it.  But I can show you

1    that, at most, there's 6.38 percent of products were sold

2    without misrepresentations during this time period.  It's

3    infinitesimal.

4            But not only that, in order not to be a class

5    member, a person would have to buy that product during that

6    time period and only during that time period and not before

7    or after.

8            Because remember.  What they did is they used

9    these basically during holiday seasons.  They put holiday

10   packaging on it.  They put it over the sensible solutions

11   thing.  So they said:  Well, we put holiday packaging on it

12   in Wal-Mart for three months so all of a sudden your class

13   isn't ascertainable.

14           Well, you know, I would say:  So what?  So, okay,

15   some people who bought it at Wal-Mart during those three

16   months may not have been exposed to misrepresentation on

17   that particular time.

18           But remember.  It's Kraft who said that repeat

19   purchases are a significant determination of sales for their

20   products.  So it's highly likely that these people purchased

21   the product before Wal-Mart at Christmastime and after

22   Wal-Mart at Christmastime; and so these people would be part

23   of the class notwithstanding.

24           I think if it boils down to it, these sort of

25   outliers where the misrepresentation wasn't on the package

1   is a fractional of a percent of any of the products or the

2   sales involved here.

3          And if it had been more, Kraft would have noted

4   that in the Smith declaration when she said:  Well, we used

5   it during the three months.  She would have said:  You know,

6   if it was 50 percent of sales, we would have a problem

7   because how would we determine 50 percent versus the other

8   percent.

9          But what we've got here is a 94, 95, 98 percent

10  chance maybe that somebody is a member of this class

11  notwithstanding that there were these outliers sold during

12  the period.

13         And the reason I think TFT is so important is

14  because in that case the court accepted an 80 percent

15  likelihood that somebody was in the class as sufficiently

16  ascertainable.

17         And what the court said is this really boils down

18  to proof of membership; and that's a distinct concept from

19  ascertainability:  Who's bound by it.  We know who's bound

20  by it.  The person who's bound by it is somebody who bought

21  this product with this representation on it and that's

22  almost everybody who would be in the class.

23         But I think all this will require is people to

24  remember whether they bought one of these products from 2006

25  to 2010; and that's something people can remember.  I mean,

1    these are repeat purchasers.

2          Kraft's document say they target mothers of young

3    children.  These are mothers who go to the grocery store

4    and, you know, buy Teddy Grahams once a month or whatever.

5          And at the end of the day, we will have records

6    that we can compare against potential class -- if there's a

7    claims.  Remember.  All this matters for is if there's ever

8    a claims period after a settlement or a judgment.

9          But, for example, Kraft has records of the

10   retailers it sold it to.  It has records of the number of

11   units it sold and the price.

12         THE COURT:  The only problem is, to tell you the

13   honest truth, is to get to a point where we allow persons to

14   more or less self-select themselves to come into this class,

15   the notice and things of that sort will be more expensive

16   probably than whatever they're going to get back from these

17   purchases.  I mean, it is, you know, a --

18         MR. FITZGERALD:  Well, Your Honor, that's not a

19   reason to deny certification and --

20         THE COURT:  Perhaps it's a reason to deny

21   certification for (b)(3) in light of all the other problems

22   that the court has already discussed, you know.

23         MR. FITZGERALD:  Your Honor, I mean, these

24   products are $4 billion in sales so I don't think class

25   notice is going to cost more than, you know, a potential --

```
1          I mean, we're not going to get the 4 billion back

2   if Your Honor is not willing to give refunds; and, actually,

3   it's really 12 percent of that because that was the

4   nationwide sales and we're in California now.

5          But the fact is these sales are very significant

6   and the issue isn't whether the extent of the class is

7   damages.  It's whether the criteria are met.

8          Yeah, notice may cost Kraft.  We've asked Kraft to

9   pay notice.  It may cost Kraft $100,000 or $200,000 to make

10  notice.

11         THE COURT:  It cost Kraft considerably more than

12  that and --

13         MR. FITZGERALD:  Well, just to make notice in

14  California won't cost more than that.  That's a fair number

15  for notice in California.  We made that request in a

16  footnote in our opening brief and Kraft didn't address it or

17  contest it.

18         THE COURT:  For example, in other words:  Did you

19  ever buy any of these products during this period of time?

20  Or is it going to be something more specific?

21         Did you buy any of these products at this point in

22  time with any of the following on the packaging?

23         MR. FITZGERALD:  Well, Your Honor, in order to

24  address this, we submitted a trial plan; and the first

25  exhibit to that trial plan was a proposed or an exemplar
```

1    class notice.

2           Dr. Kivetz had purported problems with it and

3    maybe Kraft does.  But what happens is you certify a class

4    and then the issue of notice comes afterwards.

5           And, typically, the court will order the parties

6    to confer on the notice and propose something to the class

7    and that's what we'll do.

8           I mean, actually, TFT addresses this, too.  There

9    were thousands and thousands of models of TVs, computers,

10   and laptops that had the panels in it that were at issue;

11   and the court said:  Of course we can't have a notice that

12   lists thousands of these things.  But, ultimately, it found

13   that issue of notice wasn't particularly relevant or

14   compelling.

15          I'd just direct the court's attention to pages

16   about 41 and 42 of that decision, the TFT decision.

17          In any event, on the damages issue, the Ninth

18   Circuit has said that it cannot defeat certification; and

19   from the tentative, it seemed like the court's only --

20   although the court had some reservation about other issues,

21   ultimately the court said the only issue that really would

22   prevent it at this point from certifying a (b)(3) class is

23   the proof of damages issue.

24          THE COURT:  Well, let me put it this way.  I've

25   also indicated that there are certain of the subclasses I

1    would not approve and I've indicated those.

2         I've also asked whether or not for purposes of the

3    dates whether or not the dates that the plaintiffs are

4    proposing the defendants are objecting to, and I haven't

5    heard anything from the defense in that regard.

6         MR. PANOS:  Well, Judge, their dates keep

7    changing.  Yes, we are objecting because there are periods

8    of time here where clearly there's nothing at issue.

9         But I don't know how to address it other than to

10   say that within the timeframes that they are proposed for

11   classes, we -- you can't identify membership and the class

12   can't ascertain it because of the differential in product.

13        And by the way, Mr. Fitzgerald's statement about,

14   you know, our calculation of 6 percent, I mean, that's made

15   up out of whole cloth.

16        But in addition to that, it's not just that there

17   were long periods where there was nothing on the packaging

18   that was challenged, that for many of these products the

19   message changed.

20        It might have had this message versus that

21   message.  It might have been on the front versus the back

22   which creates some of the problems Your Honor noted in here.

23        So it's not just -- it's just there were long

24   periods of time where they didn't have the message and

25   Mr. Fitzgerald's statement about repeat purchases, well,

1    guess what that would include?

2          That would include the decades when you didn't

3    have the statement on there.  Okay?  So, you know, it plays

4    both ways.

5          But the point of the matter here, Judge, is that

6    no matter how you, you know, look at it in that way, you're

7    going to have the same major problems in looking at the

8    class because of the variability over the time.

9          And the only cases that have been certified that

10   they cite are uniform representations -- meaning the same.

11   "Uniform" means the same -- to an identifiable class of

12   persons where the court can find that, yes, this is a group

13   of people that for, you know, clearly would have found this

14   to have been a significant reason in their purchase decision

15   which is why the Ninth Circuit case of *Sterns* he keeps

16   talking about is, you know, well, there's a whole host of a

17   myriad of reasons why somebody would have bought it.

18         It's why the Ninth Circuit affirmed the district

19   court case just a month ago saying there's all sorts of

20   reasons why somebody didn't get the discount that they would

21   have wanted that's unrelated to the defendant's conduct.

22         They may have forgotten to cancel their

23   membership.  They may have just forgotten to order the game.

24   There might have been all sorts of reasons that this court

25   is not inclined to just accept somebody's subjective

1  statement that I wouldn't have done this or I would have

2  done this based on that.

3          And unfortunately for plaintiffs in this case,

4  their own plaintiffs said:  I would have still bought the

5  product and I would have paid the same price.  I mean, the Q

6  and A is so clear on that.  I don't even know why we keep

7  doing this.

8          THE DEFENDANT:  Not quite so clear as --

9          MR. PANOS:  Well, Judge, I don't know how you can

10 say anything different other than:  Here's the question.

11 Here's the answer.

12         And the fact that you make a bunch of self-serving

13 statements around the edges -- that doesn't affect the

14 prosecutor from saying:  Hey, the guy admitted to the murder

15 five times and who cares what he said that he wasn't there

16 20 other times.

17         And it doesn't matter.  But look.  If they want to

18 try another shot at this and Your Honor is going to let

19 them, I guess we'll just address all these issues again but

20 I think there's a limit.

21         THE COURT:  Well, but I'll give them another shot.

22 I want it to be more -- you know, I want it to be more

23 pinpointed because, again, I agree with the defense in one

24 sense.  I'm getting tired of these as well.

25         So this is what I will do.  Let me think about

1    this stuff a little bit more and I'll either have you come

2    back and give you my final final on this tentative or

3    whatever.  But I want to think about some of the things both

4    sides have said a little bit more.

5              Are you guys free to come back?  Well, I'll just

6    put it as a potential come-back date.  When's the next

7    scheduled -- anything else scheduled in this matter?

8              MR. PANOS:  I don't think we have anything on the

9    calendar, Judge.

10             THE COURT:  Okay.  In that case, why don't I have

11   you guys come back maybe in two weeks, maybe put it on the

12   26th.  Is that a doable date for both sides?

13             MR. PANOS:  Can I just take a look here, Judge?

14                    (Pause in the proceedings.)

15             MR. PANOS:  Sure.  That's fine.

16             THE COURT:  Okay.  On the 26th.

17             And what I'd like you to do is call my clerk up on

18   the 24th, you know, and ask if you really need to come

19   because it might be a situation where I can either do it

20   either telephonically or I'll issue something in writing or

21   something else or I may want you actually to appear to argue

22   something in addition.  Okay?

23             So anything else, gentlemen and lady?

24             MR. PANOS:  Thank you, Your Honor.

25             THE COURT:  Okay.  Have a very nice day.

55

1          MS. WADE:  Thank you, Your Honor.

2        *(At 11:06 a.m. proceedings were concluded.)*

3

4                  *-oOo-*

5

6                **CERTIFICATE**

7

8       **I, PAT CUNEO, CSR 1600, hereby certify that**

9  **pursuant to Section 753, Title 28, United States Code, the**

10  **foregoing is a true and correct transcript of the**

11  **stenographically reported proceedings held in the**

12  **above-entitled matter and that the transcript page format is**

13  **in conformance with the regulations of the Judicial**

14  **Conference of the United States.**

15  Date:  April 13, 2012

16

17

18

19

20                  **/s/ PAT CUNEO**

21                  **PAT CUNEO, OFFICIAL REPORTER**
                      **CSR NO. 1600**

22

23

24

25